RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ROY B. JACKSON,

      *Petitioner-Appellant,*

    *v.*

KENNETH T. MCKEE, Warden,

      *Respondent-Appellee.*

No. 07-1247

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 05-60131—John Corbett O'Meara, District Judge.

Argued: May 1, 2008

Decided and Filed: May 12, 2008

Before: BATCHELDER, SUTTON, and FRIEDMAN, Circuit Judges.[*]

_____

### COUNSEL

**ARGUED:** Marla R. McCowan, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellant. Brian O. Neill, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Marla R. McCowan, Michael L. Mittlestat, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

### OPINION

_____

    SUTTON, Circuit Judge. A state court jury convicted Roy Jackson of felony murder, armed robbery and carrying a firearm during the commission of a felony. The Michigan Court of Appeals affirmed the felony-murder and firearm convictions and reversed the armed-robbery conviction. In reaching these conclusions, the state court denied Jackson's claims that his confession was involuntary, that his *Miranda* waiver was not knowing or intelligent and that the admission of non-testimonial hearsay statements violated the Confrontation Clause. Because the state court decisions were neither contrary to, nor an unreasonable application of, Supreme Court precedent, we affirm the district court's denial of Jackson's habeas petition.

_____

[*]The Honorable Daniel M. Friedman, Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

I.

On December 11, 2000, a group of men robbed a Dollar Value store in Detroit, Michigan, and shot and killed the store's owner, Hani Zebib. After an initial investigation, the police contacted Jackson and asked him to come to the police station to answer questions about the incident—which Jackson did at 8:00 a.m., January 6, 2001.

At 10:30 a.m. that morning, Detroit Police Investigator Barbara Simon advised Jackson of his *Miranda* rights, which Jackson waived, and began interrogating him. During the two-hour interrogation, Jackson denied any involvement in the crimes. The officers nonetheless arrested Jackson and moved him to the homicide department for holding. At 3:00 p.m., Simon again interrogated Jackson, and Jackson again denied committing the crimes. After the second round of questioning, officers returned Jackson to his holding cell in the homicide department, where he sat in isolation for the rest of the day.

The next day, officers interviewed Tykee Ross. As part of the interrogation, the officers gave Ross a polygraph examination, and Ross eventually signed a statement implicating Jackson in the robbery and murder.

After Ross fingered Jackson in the crimes, the officers interrogated Jackson again. At 7:30 p.m., Sergeant Maria Cox-Borkowski again advised Jackson of his *Miranda* rights, which he again waived, and proceeded to interrogate him. During the hour-long interrogation, Jackson continued to deny any involvement in the crimes, after which the officers asked Jackson to take a polygraph test. At 9:55 p.m., Investigator Andrew Sims advised Jackson of his rights, and, at 11:55 p.m., Sims began the test. The polygraph ended at 12:10 a.m. that night, with Jackson still denying any involvement in the crimes. After the polygraph, Sims continued to interrogate Jackson, and, twenty to thirty minutes later, Jackson changed his story, confessing to the robbery and the murder.

At 2:15 a.m. later that night, Simon again met with Jackson and advised him of his rights once more. Jackson told her that he understood his rights and, at 2:40 a.m., he signed a waiver of his *Miranda* rights. He then signed a statement admitting that he shot Zebib while robbing the store with Ross and Demel Dukes. Jackson concluded the statement by saying, "I'm sorry for what happened. I didn't mean for anyone to be shot and killed. I'm so very sorry." JA 107.

The State charged Jackson, Ross and Dukes with armed robbery, felony murder and possession of a firearm during the commission of a felony. The three defendants were tried jointly but before two separate juries—one for Jackson, the other for Ross and Dukes—and the juries convicted all three defendants of felony murder, Mich. Comp. Laws § 750.316, and armed robbery, *id*. § 750.529, and Jackson's jury also convicted him of possessing a firearm during the commission of a felony, *id*. § 750.227b.

The court sentenced Jackson to life imprisonment without the possibility of parole on the murder count, a concurrent term of 18–30 years on the robbery count and a consecutive term of two years on the felony-firearm count. Jackson appealed to the Michigan Court of Appeals. The Michigan Court of Appeals reversed Jackson's armed-robbery conviction, but it affirmed his felony-murder and firearm convictions. The Michigan Supreme Court denied leave to appeal.

Jackson filed a habeas petition in federal court, challenging (1) the state court's conclusion that his confession was voluntary, (2) its conclusion that his *Miranda* waiver was knowing and intelligent and (3) the state court's admission of hearsay statements at trial. The district court denied Jackson's petition but granted a certificate of appealability on each issue.

II.

This case, the parties agree, is covered by the Anti-Terrorism and Effective Death Penalty Act of 1996. 28 U.S.C. § 2254. To prevail on any of his three requests for habeas relief, as a result, Jackson must show not only that the state courts erred in ruling on his constitutional claim but also that their decision was contrary to, or an unreasonable application of, Supreme Court precedent. *See id*. § 2254(d).

A.

Jackson first argues that the state court's admission of his confession at his criminal trial violated due process because he made it involuntarily. *See Miranda v. Arizona*, 384 U.S. 436, 462 (1966). "[C]ertain interrogation techniques," it is true, "are so offensive to a civilized system of justice that they must be condemned under the Due Process clause." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Accordingly, when a criminal defendant can show that "coercive police activity" caused him to make an involuntary confession, due process prohibits the government from relying on the statement. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also Reck v. Pate*, 367 U.S. 433, 440 (1961) (holding that an interrogation violates due process if the suspect's will is overborne at the time he confessed). Whether an interrogation rises to the level of coercion turns on a spectrum of factors: the age, education and intelligence of the suspect; whether the suspect was advised of his *Miranda* rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep or other creature comforts. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

Consistent with these factors, the Michigan courts reasonably determined that Jackson's interrogation was not coercive. Jackson voluntarily reported to the police station and agreed to be questioned. Before asking any questions, the officers advised Jackson of his *Miranda* rights, which he waived no fewer than four times during the interrogations. And when Jackson ultimately confessed, he added a statement of remorse, saying he was "sorry for what happened," JA 107—suggesting that it was his conscience, not the police, that overbore his prior efforts to disclaim any responsibility for the robbery and murder. Other contextual clues point in the same direction. Jackson told the officers that he could read and write and that he understood the rights he was waiving. At no point during the questioning did Jackson indicate that he did not understand his rights. He never said he was tired, confused or uncomfortable. And he confirmed in his written confession that he was not "deprived of food, water or use of the restroom." JA 567.

Nor was Jackson unfamiliar with the criminal justice system. He had six juvenile indictments filed against him prior to this arrest. He was not ill, injured or under the influence of drugs or alcohol. He never asked for an attorney. He never asked the agents to stop questioning him. And he acknowledges that he was not threatened, harmed or promised anything to compel his confession. All things considered, this is not the "rare" case in which a suspect "can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement officers adhered to the dictates of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). Jackson, in short, has not shown that the prophylactic *Miranda* warnings were not prophylactic enough.

Jackson counters with the following facts: the interval between his first interrogation and his last one was 40 hours; he signed his written confession in the early morning hours at the end of these serial interrogations; and he could read at only a third-grade level. The officers' questioning, however, never exceeded two and a half hours at a time; Jackson never said he did not understand the *Miranda* warnings, even after receiving them multiple times; and he never expressed any lack of understanding regarding the confession he was signing.

These circumstances do not rise to the level of the kinds of involuntary-confession fact patterns that the Supreme Court has condemned; still less do they show that the Michigan courts unreasonably applied these precedents—most of which did not even involve *Miranda* warnings, as here. *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 398–402 (1978) (holding that a confession was involuntary where officers questioned the defendant over his objection for four hours while he was incapacitated and sedated in an intensive-care unit); *Greenwald v. Wisconsin*, 390 U.S. 519, 520–21 (1968) (holding that a confession was involuntary where officers questioned the defendant for more than 18 hours while depriving him of food, sleep and medication); *Beecher v. Alabama*, 389 U.S. 35, 38 (1967) (holding that a confession was involuntary where officers, already having wounded the defendant, ordered him at gunpoint to confess or be killed); *Davis v. North Carolina*, 384 U.S. 737, 745–47 (1966) (holding that a confession was involuntary where officers interrogated the defendant over 16 days and held him incommunicado in a closed cell without windows and with limited food); *Reck*, 367 U.S. at 441–42 (holding that a confession was involuntary where the officers held the defendant for four days with inadequate food and medical attention); *Culombe v. Connecticut*, 367 U.S. 568, 626 (1961) (holding that a confession was involuntary where officers held the defendant and subjected him to five days of "systematic" and continuous questioning); *Payne v. Arkansas*, 356 U.S. 560, 566–67 (1958) (holding that a confession was involuntary where officers held the defendant incommunicado for three days with little food and threatened to expose him to mob violence if he did not confess).

*Ashcraft v. Tennessee*, 322 U.S. 143 (1944), does not give Jackson's argument traction. It involved an interrogation in which the suspect was questioned for 36 consecutive hours and denied sleep and rest. *Id*. at 153–54. Yet Jackson was never interrogated for more than two and a half hours at a time and he was never prevented from sleeping or resting. There also was a considerable gap in time—24 hours—between his confession and the prior interrogation. *Cf. Culombe*, 367 U.S. at 626–27 ("[In] cases in which we have sustained convictions resting on confessions made after prolonged detention, questioning . . . had been discontinued during a considerable period prior to confession, so . . . we did not find . . . that police interrogators had overborne the accused.").

*Haley v. Ohio*, 332 U.S. 596 (1948), does not change matters. Police arrested a 15-year-old male in his home, took him to the police station and questioned him from midnight to 5:00 a.m., when he confessed. *Id*. at 598. The Court ruled that the "age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction." *Id*. at 600–01. Jackson, by contrast, was older (17 years old); he was questioned intermittently, not continuously; he was told repeatedly of his rights to counsel and to remain silent; and no evidence shows that the officers took a "callous attitude" toward his rights. *Id*. More to the point, the question is not whether a state court could plausibly extend *Haley* to this fact pattern, a point we need not decide; the question is whether the Michigan courts acted unreasonably in declining to extend this pre-*Miranda* precedent here. They did not.

B.

Jackson next argues that his *Miranda* waiver was not knowing or intelligent. To be effective, a *Miranda* waiver must be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). That does not mean, however, that the police must supply a suspect with enough "information to help him calibrate his self-interest in deciding whether to speak or stand by his rights," as such additional information goes only to "the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Colorado v. Spring*, 479 U.S. 564, 576–77 (1987).

The circumstances surrounding Jackson's waiver confirm that the state court reasonably applied Supreme Court precedent in determining that Jackson was aware of the nature of the right he was waiving and the consequences of his decision to waive it. Over the course of Jackson's interrogation, officers advised him of his *Miranda* rights at least four times. The officers read his rights to him, asked him to read his rights and asked him to repeat his rights as he understood them. Jackson waived his rights both orally and in writing. Jackson stated that he understood his rights, and at no point did Jackson indicate that he did not want to waive them.

When Jackson confessed, he remained lucid, coherent and remorseful. He confessed first in an oral statement, then he reduced that statement to writing. In his written statement, Jackson described the crime:

> It was December 11, 2000. It was about four o'clock p.m. It was me, Tykee and Demel. We all went up to the Dollar Store to rob the store. I don't remember if anyone was in the store buying anything. I went in the store first and Tykee and Demel came in behind me. I had the gun. The man was behind the counter. I told him to open up the cash register. The man just looked at me. I fired one shot up in the air. The man opened up the cash register and Demel went behind the counter and got the money out of the cash register. I told the man not to move. I saw that the man was backing up some. He kept on moving. I told him again don't move. He moved and that's when I shot him. After that we all ran out of the store. After we ran out of the store we all went over to a vacant house on Cherrylawn. After we got to the vacant house Demel had the money. Demel gave me my part of the money and he gave Tykee his part of the money. After that we all left out of the vacant house.

JA 564–65. After offering this description of the crime, Jackson responded in writing to questions from Officer Simon, providing additional details about the crime and explaining that he robbed the store "[b]ecause it was close to Christmas[,] and [he] wanted to buy [his] baby something." JA 567.

Dr. Edith Montgomery, the State's expert witness, agreed that Jackson's waiver was knowing and intelligent. During a pre-trial evaluation, Montgomery read each *Miranda* right to Jackson and asked him to explain what each of them meant. Jackson explained his rights as he understood them: "I ain't got to talk," JA 72; "if I go to court anything I said can be used against me," *id.*; "I ain't got to say nothing until an attorney gets there," *id.*; and "[t]hey will pay for me an attorney," *id.*

Jackson responds that, because he required special-education classes and because he reads at only a third-grade level, his waiver could not have been knowing and intelligent. But those facts alone do not undermine a waiver—and no authority says they do. While the evidence showed that Jackson had difficulty reading, it also showed that he had average problem-solving skills and intelligence. Jackson waived his rights not only after reading them, moreover, but also after having them read to him and after accurately explaining to the officers what he understood his rights to be. And only one of the waivers of his *Miranda* rights was in writing; he gave the other three waivers orally. Because "there is nothing cognitively complex about the advice that one has a right to remain silent and not to talk to the police," *Finley v. Rogers*, 116 F. App'x 630, 638 (6th Cir. Nov. 18, 2004); *see also Clark v. Mitchell*, 425 F.3d 270, 283–84 (6th Cir. 2005), because Jackson had average problem-solving skills and intelligence and because his considerable prior experience with the criminal justice system gave him reason to know the consequences of waiving these rights, the state court did not unreasonably apply Supreme Court precedent in holding that his waiver was knowing and intelligent.

Jackson points out that his expert, Dr. Michael Abramsky, testified that Jackson's mental deficiencies would have made it impossible for him competently to waive his rights. One answer

is this: Dr. Montgomery testified that Jackson's performance in his evaluations suggested he was not putting forth full effort and may have exaggerated his deficiencies. Another answer is this: the parties presented competing accounts of Jackson's capabilities, and the state court, after weighing the evidence, determined that Jackson's waiver was knowing and intelligent. Because Jackson presents no Supreme Court precedent that calls the state court's determination into question and because the evidence reasonably supports that determination, AEDPA requires us to reject this argument.

C.

Jackson next argues that the trial court's admission of non-testimonial hearsay statements violated his Sixth (and Fourteenth) Amendment rights under the Confrontation Clause. "In all criminal prosecutions," that provision says, "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Because the state court reasonably applied Supreme Court precedent in denying this claim, we must reject this argument as well.

At trial, the State introduced testimony from Ramone Neal implicating Jackson in the robbery and murder. One afternoon, Neal testified, he ran into Ross and asked him for a ride. Ross refused, telling him that he had to "hurry up and go somewhere . . . we just did a robbery at the Dollar Store" and Jackson "just shot the man in the stomach." JA 396–97. Jackson, Ross told Neal, was "nothing to f\*\*\* with." JA 420. Conceding then (as he does now) that these statements were non-testimonial, *see Davis v. Washington*, 547 U.S. 813, 822 (2006), Jackson objected to the testimony on Confrontation Clause grounds.

When Jackson raised this objection, Supreme Court precedent said that non-testimonial hearsay statements implicated a defendant's confrontation rights. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980). Under *Roberts*, Ross' non-testimonial hearsay statements could be admitted, consistent with Jackson's Confrontation Clause rights, only if Ross was unavailable to testify and if the statements bore an "adequate indicia of reliability." *Id.* (internal quotation marks omitted). A statement possesses an "adequate indicia of reliability" either if it is a "firmly rooted" hearsay exception or if it offers other "particularized guarantees of trustworthiness." *Id.*

The wrinkle is that, since Jackson's trial, the Supreme Court has changed course, *see Crawford v. Washington*, 541 U.S. 36, 61–62 (2004), overruling *Roberts* and recognizing that non-testimonial hearsay does not implicate the Confrontation Clause, *see Davis*, 547 U.S. at 823–26. All of which prompts this question: what happens under AEDPA-constrained habeas review when a state court decision on direct review may amount to an unreasonable application of Supreme Court precedent but that precedent is overruled before a federal court entertains the habeas petition?

Jackson argues that, because he can satisfy the requirements of 28 U.S.C. § 2254(d)(1)—by showing that the court's decision "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States"—habeas relief is appropriate. The State counters that § 2254(d)(1) is a necessary, but not a sufficient, condition for habeas relief. Even if he could meet the "unreasonable application" requirement set forth in § 2254(d)(1), Jackson needs more. Section 2254(a) independently limits habeas relief to situations where a person "is in custody in violation of the Constitution or laws or treaties of the United States"—and that would not appear to be true here because Jackson is not *currently* being held in violation of the Constitution. *See Flamer v. Delaware*, 68 F.3d 710, 725 n.14 (3d Cir. 1995) ("*Teague*['s] [non-retroactivity rule] only applies to a change in the law that *favors* criminal defendants."); *cf. Danforth v. Minnesota*, 128 S. Ct. 1029, 1047 (2008) ("It would be quite wrong to assume . . . that the question whether constitutional violations occurred in trials conducted before a certain date depends on how much time was required to complete the appellate process."); *Lockhart v. Fretwell*, 506 U.S. 364, 373 (1993) ("[T]he State will benefit from our *Teague* decision

in some federal habeas cases, while the habeas petitioner will not. This result is not . . . a 'windfall' for the State, but instead is a perfectly logical limitation of *Teague* to the circumstances which gave rise to it.").

Jackson, at any rate, loses either way. Under today's precedent, Jackson loses because *Davis* makes clear that the Confrontation Clause does not prevent the admission of non-testimonial hearsay. Under yesterday's precedent, Jackson loses because the state court reasonably applied the *Roberts* test. Ross' statements, the state court concluded, offered "particularized guarantees of trustworthiness," *Roberts*, 448 U.S. at 66, and thus did not violate Jackson's Confrontation Clause rights. In support of its decision, the court noted that (1) Ross' statements to Neal were voluntary, (2) they were spontaneously made, (3) they were contemporaneous with the crimes, (4) they were made from one friend to another and (5) they did not reflect an attempt to downplay Ross' own involvement but indeed implicated him in the crimes. *See Williamson v. United States*, 512 U.S. 594, 605 (1994) (noting, under the *Roberts* test, that "the very fact that a statement is genuinely self-inculpatory . . . is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause"). In view of the "considerable leeway" *Roberts* once granted trial courts to determine whether non-testimonial hearsay statements comply with the Confrontation Clause, *Idaho v. Wright*, 497 U.S. 805, 822 (1990), we can safely say that the state court reasonably applied then-existing Supreme Court precedent in determining that Ross' statements offered the particularized guarantees of trustworthiness *Roberts* requires.

III.

For these reasons, we affirm.