RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AHMAD FAWZI ISSA,

                                        *Petitioner-Appellant,*

                                                                        No. 15-4147

*v.*

MARGARET BRADSHAW, Warden,

                                        *Respondent-Appellee.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:03-cv-00280—Sandra S. Beckwith, District Judge.

Argued:  May 2, 2018

Decided and Filed:  September 21, 2018

Before:  COLE, Chief Judge; MERRITT and MOORE, Circuit Judges.

---

## COUNSEL

**ARGUED:**  S. Adele Shank, LAW OFFICE OF S. ADELE SHANK, Columbus, Ohio, for Appellant.  Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  S. Adele Shank, LAW OFFICE OF S. ADELE SHANK, Columbus, Ohio, Lawrence J. Gregor, Dayton, Ohio, for Appellant.  Jocelyn K. Lowe, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

        MOORE, J., delivered the opinion of the court in which COLE, C.J., and MERRITT, J., joined.  MERRITT, J. (pp. 18–21), delivered a separate concurring opinion.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge.  Ahmad Issa ("Issa"), sometimes known as Mike, petitioned the district court for a writ of habeas corpus.  The district court denied all of Issa's grounds for relief, but it granted a certificate of appealability for Issa's first, third, fourth, fifth, sixth, ninth, eleventh, twelfth, twenty-seventh, pending twenty-eighth, pending twenty-ninth, and proposed twenty-eighth through thirty-seventh grounds.  R. 218 (Order at 120) (Page ID #4717).  For the following reasons, we **VACATE** and **REMAND** to the district court with instructions to grant a **CONDITIONAL WRIT OF HABEAS CORPUS**, giving the State of Ohio 180 days to retry Issa or to release him from custody.

## I.  BACKGROUND

### A.  Factual Background

On November 22, 1997, around 1:30 a.m., Andre Miles ("Miles") demanded money from two brothers, Maher Khriss ("Maher") and Ziad Khriss ("Ziad"), outside of Maher's store, Save-Way II Supermarket ("Save-Way") in Cincinnati.  *State v. Issa (Issa I)*, 752 N.E.2nd 904, 910 (Ohio 2001).  After Maher and Ziad put money on the ground, Miles shot both of them with a high-powered assault rifle.  *Id.*  The Cincinnati police examined Miles's actions, and they hypothesized that Issa, an employee at Save-Way, had hired Miles to commit the murders because Linda Khriss ("Linda"), Maher's wife, offered Issa money to kill her husband.  *Id.*  The police speculated that Issa gave Miles the rifle and planned where Miles would shoot Maher.  *Id.*  Because of this theory, the State charged all three individuals with aggravated murder, and each defendant stood trial.  *Id.*  A jury, however, acquitted Linda, and Miles received a life sentence—Issa is the only one to receive a death sentence.  *Id.* at 913, 928.

During the guilt phase in Issa's trial, Miles refused to testify even though he had already testified in Linda's earlier trial.  R. 229-3 (App., Trial Tr. at 938–40) (Page ID #9504–06).  Prior to his taking the stand, the prosecution had offered Miles immunity, but the prosecution revoked Miles's immunity the day before he was scheduled to make statements in Issa's trial.  *Id.*

Because Miles refused to testify, the trial court concluded that he was unavailable. *Id.* at 945 (Page ID #9511).

The trial court allowed the admission of Miles's out-of-court statements, however, through the testimony of siblings, Bonnie Willis ("Bonnie") and Joshua Willis ("Joshua") (together, the "Willises"), who were Miles's teenage friends at the time of the murders. *Id.* at 1087, 1162–63 (Page ID #9653, 9728–29). Joshua testified that, a few days prior to the murders, he ran into Miles at the Save-Way, and Miles told Joshua that Issa had paid him to kill someone. *Id.* at 1164–65 (Page ID #9730–31). Miles asked Joshua if he wanted to help, but Joshua declined the offer and did not believe Miles was serious. *Id.* When Joshua told Bonnie about Miles's statement, she did not think Miles would actually kill anyone because Miles talked "about doing a lot of things and never did it." *Id.* at 1126 (Page ID #9692). Then, according to Joshua, around 5:00 p.m. on November 22, Miles called Joshua and told him that he had killed Maher and Ziad. *Id.* at 1167 (Page ID #9733). Miles informed Joshua that Miles had placed the rifle in a plastic bag and had put it in the Willises' backyard. *Id.*

The next day, according to the Willises' testimony, Miles went to the Willises' home and described the murders. *Id.* at 1094–97, 1168–69 (Page ID #9660–63, 9734–35). The Willises testified that Miles told the Willises that Issa was going to give Miles $2000 for killing Maher. *Id.* at 1106 (Page ID #9672). At Issa's trial, the Willises described Miles's statements to them about how the murders occurred; for instance, Bonnie stated that Miles said that he got the rifle, which was hidden behind some crates that were behind a dumpster at the Save-Way, and then waited for Maher to come back to the store. *Id.* at 1106–07 (Page ID #9672–73). Bonnie then testified that Miles told the Willises that, when Miles saw Maher with Ziad, Miles demanded money from them, and they placed money on the ground. *Id.* at 1107–08 (Page ID #9673–74). Miles told the Willises that as he was bending to pick up the money, however, the rifle went off and shattered Maher's beverage bottle. *Id.* According to Bonnie, Miles said that he shot each brother several times. *Id.* Bonnie then testified that Miles stated that Miles ran to the Willises' home and put the rifle in their yard; Miles then might have met Issa at a nearby parking lot, and Issa perhaps then drove Miles home. *Id.* at 1103–04 (Page ID #9669–70). The Willises also

testified at Issa's trial that, while Miles told this story, they thought that Miles was bragging. *Id.* at 1032, 1174–75 (Page ID #9598, 9740–41).

Joshua also testified at Issa's trial that, several days later, Joshua ran into Issa at the Save-Way, and Issa asked Joshua "Does anybody know?" and Joshua said "No, not that I know of." *Id.* at 1183 (Page ID #9749). During this discussion, Joshua told Issa that Issa needed to get the rifle from the Willises' backyard. *Id.* at 1171 (Page ID #9737). Issa replied that he would talk to Miles and that Miles would get the rifle. *Id.* When Joshua noticed that the bag was still in his yard, he confronted Issa again at the Save-Way. *Id.* at 1172 (Page ID #9738). Bonnie also testified that she told Issa he needed to get the rifle from their yard, and during this conversation, Issa asked Bonnie to tell Miles to not go near the store because police were investigating. *Id.* at 1099, 1133–32 (Page ID #9665).

Renee Hayes ("Hayes"), another Save-Way employee, also testified at Issa's trial. *Id.* at 836 (Page ID #9401). Hayes testified that she thought that she observed Linda and Issa exchange $2000 on November 25, but she was not certain and did not pay close attention. *Id.* at 847, 857 (Page ID #9412, 9422). Hayes also testified, however, that all employees would help count and package money. *Id.* at 846 (Page ID #9411). Furthermore, Hayes did not hear Linda or Issa make statements regarding a murder, but she did hear them discuss making a deposit for the store. *Id.* at 853–54 (Page ID #9418–19). According to Hayes, the money was deposited into the store's checking account on November 25. *Id.* at 853 (Page ID #9418).

Additionally, Dwayne Howard, Hayes's husband, testified, and he stated that he saw a rifle at Issa's apartment. *Id.* at 861, 864–66 (Page ID #9427, 9430–32). Howard then identified during Issa's trial the rifle that he saw in Issa's apartment as the murder weapon. *Id.* at 866 (Page ID #9432). Also, according to Howard, Issa told Howard "Don't be telling people [sic] no lies [sic] and stuff like that, seen him with a gun [sic]." *Id.* at 869 (Page ID #9435). On the other hand, Howard also stated that he does not know anything about guns and that he would not be able to identify the murder weapon if there were two identical rifles in front of him. *Id.* at 872, 875 (Page ID #9438, 9441).

Souhail Gammoh ("Gammoh"), another Save-Way employee, also testified that, on the night of the murders, Issa gave him a ride home from work. *Id.* at 887 (Page ID #9453). When Issa dropped Gammoh off between 1:14 and 1:20 a.m., Issa told Gammoh that he might pick Gammoh up later to go to a bar. *Id.* at 890 (Page ID #9456). Issa eventually did return around twenty-five or thirty-five minutes later, but Gammoh based this time range on the amount of beer that he had consumed from the time that Issa dropped off Gammoh and then returned. *Id.* at 894 (Page ID #9460).

Gammoh then testified that, at the crime scene, Gammoh told an officer that he and Issa closed the store, dropped off Issa's mom, and then went to the bar; he did not mention to the officer, however, that Issa was not with Gammoh all night. *Id.* at 903–04 (Page ID #9469–70). When Gammoh saw Issa later, Issa told Gammoh that the "[n]ext time they ask [Gammoh], tell them that [they] were together." *Id.* at 906 (Page ID #9472). Gammoh also testified that he observed Issa take a white trash bag out of Issa's trunk, but Gammoh did not know whether the trash bag was short-and-square or long-and-thin shaped. *Id.* at 916–17 (Page ID #9482–83). Additionally, Gammoh thought that he saw a rifle in Issa's apartment two weeks before the murders. *Id.* at 919 (Page ID #9485).

When an officer testified at Issa's trial, he stated that the police knew that the murder weapon used 7.62-caliber ammunition. R. 229-2 (App., Trial Tr. at 764–65) (Page ID #9329–30). The police then found one round of 7.62-caliber ammunition in Issa's apartment, but they did not find a weapon. *Id.* at 765 (Page ID #9330). A firearms examiner also testified that the round from Issa's apartment was from a different manufacturer than the discharged cartridge casings found next to the murder weapon. *Id.* at 777–78 (Page ID #9342–43).

Based on this evidence, on September 2, 1998, the jury convicted Issa of aggravated murder with a death penalty specification because the offense was committed for hire, so the penalty phase of the trial began. R. 229-3 (App., Trial Tr. at 1521–22) (Page ID #10089–90). Then on September 10, 1998, the jury recommend the death penalty, and the trial court sentenced Issa to death on October 16, 1998. *Id.* at 1642, 1647, 1651 (Page ID #10210, 10215, 10219).

**B. Procedural Background**

On direct appeal, the Ohio Supreme Court affirmed Issa's conviction and sentence. *See Issa I*, 752 N.E.2nd at 928. However, before the Ohio Supreme Court issued its decision, Issa filed a petition for postconviction relief. *State v. Issa (Issa II)*, No. C-000793, 2001 WL 1635592, at *1 (Ohio Ct. App. Dec. 21, 2001) (per curiam). After the trial court denied the petition, the Ohio Court of Appeals determined that Issa was not entitled to relief. *Id.* at *6. When Issa appealed this decision, the Ohio Supreme Court denied review on April 17, 2002. *State v. Issa (Issa III)*, 766 N.E.2d 162 (Table) (Ohio 2002).

On April 17, 2003, Issa filed his initial petition for writ of habeas corpus in the district court. R. 8 (Pet.) (Page ID #4784). After a series of procedural steps over the years, on September 21, 2015, the district court issued its decision regarding Issa's petition. *Issa v. Bagley (Issa IV)*, No. 1:03-CV-280, 2015 WL 5542524 (S.D. Ohio Sept. 21, 2015). The district court denied Issa's requests for relief, but it granted a certificate of appealability for several grounds: (1) first ground, failure to call Linda as a witness; (2) third and fourth ground, failure to perform adequate mitigation and present additional mitigation witnesses; (3) fifth ground, failure to obtain cultural expert and/or professional translator; (4) sixth ground, admission of the Willises' testimony about Miles's hearsay statements; (5) ninth ground, equitable tolling for ineffective assistance of appellate counsel claim; (6) eleventh ground, disproportionate sentence; (7) twelfth ground, failure to utilize mitigation expert; (8) twenty-seventh ground, appellate counsel's conflict of interest; (9) pending twenty-eighth ground, Ohio's lethal injection protocol violates the Eighth Amendment, (10) pending twenty-ninth ground, Ohio's lethal injection protocol violates the Fourteenth Amendment; and (11) proposed twenty-eighth through thirty-seventh ground, legality of Ohio's method of lethal injection. *Id.* at *54. These grounds are now before this panel.

## II. DISCUSSION

Issa filed his petition in 2003, so the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. R. 8 (Pet.) (Page ID #4784). For a question of law, this court can grant relief if a state-court judgment "resulted in a decision that was *contrary to*, or involved an

*unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). A decision is "contrary to" when "it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"[1] *Williams v. Mitchell*, 792 F.3d 606, 611–12 (6th Cir. 2015) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). "When the state court issues a decision that is contrary to federal law, we review the merits of the petitioner's claim de novo." *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006); *see also Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006). For this analysis, we cannot consider Supreme Court dicta or the decisions of the courts of appeals. *Brumley v. Wingard*, 269 F.3d 629, 638 (6th Cir. 2001).

## A. The Ohio Supreme Court's decision is contrary to Supreme Court precedent regarding the Confrontation Clause.

The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. At the time of Issa's trial in 1998, the test in *Ohio v. Roberts*, 448 U.S. 56 (1980), controlled. Eventually, in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court replaced and overruled this test in *Roberts*.[2] *See Davis v. Washington*, 547 U.S. 813, 825 n.4 (2006). *Crawford*, however, is not retroactive.[3] *See Whorton v. Bockting*, 549 U.S. 406, 421 (2007).

---

[1]This opinion will focus on the "contrary to" prong. Although Issa does not explicitly state the phrase "contrary to" in the section of his brief discussing the Confrontation Clause, he does discuss the state supreme court's improper application of Supreme Court law. *See* Appellant's Br. at 48, 58. The State also stated in its brief that the state supreme court's decision regarding the Confrontation Clause "was neither contrary to, nor an unreasonable application of, clearly established federal law." Appellee's Br. at 12. Accordingly, we will review whether the state supreme court's decision was "contrary to" Supreme Court precedent.

[2]In *Desai v. Booker*, 538 F.3d 424 (6th Cir. 2008), we stated that a habeas applicant cannot receive relief under *Roberts* when the out-of-court statements were admissible under *Crawford*. *See* 538 F.3d at 427; *see also Doan v. Carter*, 548 F.3d 449, 457 (6th Cir. 2008); *Jackson v. McKee*, 525 F.3d 430, 438 (6th Cir. 2008).

Nevertheless, the conclusions in *Desai*, *Doan*, and *Jackson* run afoul of the manner of analysis that we established in earlier cases. *See Fulcher*, 444 F.3d at 799–811; *Stallings v. Bobby*, 464 F.3d 576, 581–84 (6th Cir. 2006). In *Fulcher*, a defendant contended that the admission of a taped statement to police violated the Confrontation Clause. *See* 444 F.3d at 797. Because *Roberts* was the controlling law at the time, we considered whether the admission of the witness's statements violated the Confrontation Clause. *Id.* at 800. For this analysis, we first determined that the state court had applied law that was contrary to the governing law. *Id.* at 806. We then reviewed de novo whether the statements had sufficient indicia of trustworthiness under *Roberts*, and we concluded

Under *Roberts*, there is a two-part test to determine whether an out-of-court statement is valid under the Confrontation Clause:  the witness needs to be unavailable and the statement needs to have adequate "indicia of reliability."  448 U.S. at 66.  There are two ways that an out-of-court statement can be reliable.  First, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.*  If the statement does not fall within a firmly rooted hearsay exception, then "the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*  Whether Miles's statements to the Willises have particularized guarantees of trustworthiness is the only issue we need to address because the Supreme Court eventually abrogated the unavailability requirement before Issa's trial, *White v. Illinois*, 502 U.S. 346, 354 (1992), and the State concedes that Miles's statements do not fall within a firmly rooted hearsay exception, *see* Appellee's Br. at 30.

For this analysis, as the Supreme Court has emphasized, "'particularized guarantees of trustworthiness' *must* be shown from *the totality of the circumstances*." *Idaho v. Wright*, 497 U.S. 805, 819 (1990) (emphasis added).  It also limited the scope of circumstances that a court can examine by stating "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.*  The Supreme Court nevertheless concluded that "courts have considerable leeway in their consideration of appropriate factors." *Id.* at 822.  "[It] therefore decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the [Confrontation] Clause." *Id.*

---

that they did not. *Id.* at 808.  Next, we determined that the error was not harmless. *Id.* at 811.  Lastly, we examined the defendant's argument that *Crawford* applied. *Id.*  We stated, however, that "[g]iven our decision to order that the writ be granted on the basis of pre-*Crawford* law, we find it *unnecessary* to address . . . *Crawford*." *Id.* at 811 (emphasis added).  Thus, in *Fulcher*, we concluded that we did not need to consider *Crawford* when we had already determined that relief was warranted under *Roberts*.  We again applied this format, and rejected examining the out-of-court statements under *Crawford*, in *Stallings*, 464 F.3d at 581–84.

Because our analysis in *Desai*, *Doan*, and *Jackson* occurred after we had already established the applicable format for analyzing this issue in *Fulcher* and *Stallings*, the format in *Fulcher* and in *Stallings* controls our analysis here.  *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel.  The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision."); *see* 6 Cir. R. 32.1(b) (stating that published panel opinions are binding on all subsequent panels).  We therefore do not consider *Crawford* when the state court erred in its application of the then-governing decision in *Roberts*.

**3**In its brief, the State did not address *Desai* or whether *Crawford* applies to prevent Issa from obtaining relief. *See* Appellee's Br. at 26–33.

The Supreme Court also emphasized that this is not a slack requirement.  "Because evidence possessing 'particularized guarantees of trustworthiness' must be at least as reliable as evidence admitted under a firmly rooted hearsay exception," the Supreme Court has clarified "that evidence admitted under the former requirement must similarly be so trustworthy that adversarial testing would add little to its reliability."  *Id.* at 821.  "Thus, unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement."  *Id.*

When conducting this analysis, the Supreme Court noted that a court cannot use "a preconceived and artificial litmus test."  *Id.* at 819.  For instance, in *Wright*, the Supreme Court examined whether a child's out-of-court statements regarding abuse were sufficiently trustworthy.  *Id.* at 809, 816.  The state supreme court had determined that the testimony was not trustworthy because the interview of the child did not follow procedural safeguards.  *Id.* at 818.  "Although [the Supreme Court] agree[d] with the court below that the Confrontation Clause bars the admission of the younger daughter's hearsay statements, [it] reject[ed] *the apparently dispositive weight* placed by that court on the lack of procedural safeguards at the interview."  *Id.* (emphasis added).  In support of this reasoning, the Supreme Court stated that "[o]ut-of-court statements made by children regarding sexual abuse arise in *a wide variety of circumstances*, and [it] d[id] not believe the Constitution imposes a fixed set of procedural prerequisites to the admission of such statements at trial."  *Id.* (emphasis added).  The Supreme Court was concerned that "[t]he procedural requirements identified by the court below, to the extent regarded as conditions precedent to the admission of child hearsay statements in child sexual abuse cases, may in many instances be inappropriate or unnecessary to a determination whether a given statement is sufficiently trustworthy for Confrontation Clause purposes."  *Id.*  Thus, it concluded that, "[a]lthough the procedural guidelines propounded by the court below may well enhance the reliability of out-of-court statements of children regarding sexual abuse, [it] decline[d] to read into the Confrontation Clause *a preconceived and artificial litmus test* for the procedural propriety of professional interviews in which children make hearsay statements against a defendant."  *Id.* at 819 (emphasis added).

The plurality in *Lilly v. Virginia*, 527 U.S. 116, 136 (1999), also examined the application of the "residual trustworthiness test" to a codefendant's statements.[4]  According to the plurality, the Supreme Court "ha[s] consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person."[5]  *Id.* at 128.  "[B]ecause the use of an accomplice's confession 'creates a special, and vital need for cross-examination,' a prosecutor desiring to offer such evidence must comply with *Bruton*, hold separate trials, use separate juries, or abandon the use of the confession."  *Id.* (quoting *Gray v. Maryland*, 523 U.S. 185, 194–95) (1998)).  The plurality stated that the Court has "spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants."  *Id.* at 131 (quoting *Lee v. Illinois*, 476 U.S. 530, 541 (1986)).

The plurality in *Lilly* then noted, however, that "the presumption of unreliability that attaches to codefendants' confessions . . . may be rebutted."  *Id.* at 137 (alteration in original) (quoting *Lee*, 476 U.S. at 543).  For instance, the Supreme Court has held that "any inherent unreliability that accompanies co-conspirator statements made during the course and in furtherance of the conspiracy is *per se* rebutted by the circumstances giving rise to the long history of admitting such statements."  *Id.*  Nevertheless, the plurality noted that "[i]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice"; for instance, "when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing."  *Id.*

---

[4]We have previously concluded that Justice Stevens wrote the opinion of the court because "the remaining two justices (Scalia and Thomas) believed that the Confrontation Clause barred a *broader* range of statements against penal interest."  *Fulcher*, 444 F.3d at 800 n.4.

[5]In *Greene v. Fisher*, 565 U.S. 34, 40 (2011), the Supreme Court concluded that "clearly established Federal law" is the law that existed at the time of "the last state-court adjudication on the merits" of the claim. Because the Ohio Supreme Court adjudicated Issa's Confrontation Clause argument on the merits and the United States Supreme Court decided *Lilly* before the Ohio Supreme Court examined Issa's claim, the standards set in *Lilly* are applicable here.

In the case at hand in *Lilly*, the plurality considered several facts to conclude that "[i]t [was] abundantly clear that neither the words that [the codefendant] spoke nor the setting in which he was questioned provides any basis for concluding that his comments regarding petitioner's guilt were so reliable that there was no need to subject them to adversarial testing in a trial setting." *Id.* at 139. For instance, the plurality noted that "[the codefendant] was in custody for his involvement in, and knowledge of, serious crimes and made his statements under the supervision of governmental authorities." *Id.* The plurality also averred that the codefendant "was primarily responding to the officers' leading questions, which were asked without any contemporaneous cross-examination by adverse parties." *Id.* In light of this, the plurality resolved that the codefendant "had a natural motive to attempt to exculpate himself as much as possible." *Id.* It was furthermore concerning to the plurality that the codefendant "was obviously still under the influence of alcohol." *Id.* The plurality then concluded that "[e]ach of these factors militates against finding that his statements were so inherently reliable that cross-examination would have been superfluous." *Id.*

Under the *Roberts* standard, the Ohio State Supreme Court reviewed Issa's allegation that the admission of Miles's statements to the Willises violated the Confrontation Clause:

> Applying *Lilly* and [*State v.*] *Madrigal*[, 721 N.E.2d 52 (Ohio 2000),] to this case, it is clear that in order to determine whether the admission of evidence concerning Miles's confession violated appellant's confrontation rights, we must examine the circumstances under which the confession was made. Unlike the declarants in *Lilly* and *Madrigal*, Miles was not talking to police as a suspect when he made the out-of-court statement. Miles's confession was made spontaneously and voluntarily to his friends in their home. Moreover, Miles had nothing to gain from inculpating appellant in the crime. In fact, by stating that appellant had hired him to kill Maher, Miles was admitting a capital crime, *i.e.*, murder for hire. Furthermore, Miles's statement was clearly not an attempt to shift blame from himself because he was bragging about his role as the shooter in the double homicide.
>
> We therefore find that the circumstances surrounding the confession did "'render the declarant [Miles] particularly worthy of belief.'" *Madrigal*, 87 Ohio St.3d at 387, 721 N.E.2d at 63, quoting *Wright*, 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 655. Our decision herein is buttressed by Chief Justice Rehnquist's separate opinion in *Lilly*, in which he noted that in a prior case, the court "recognized that statements to fellow prisoners, *like confessions to family members or friends*, bear sufficient indicia of reliability to be placed before a jury

without confrontation of the declarant." (Emphasis added.) *Id.*, 527 U.S. at 147, 119 S.Ct. at 1905, 144 L.Ed.2d at 141 (Rehnquist, C.J., concurring in judgment). Accordingly, we hold that the admission of Bonnie's and Joshua's testimony concerning Miles's confession did not violate the Confrontation Clause.

*Issa I*, 752 N.E.2d at 919. Thus, the Ohio Supreme Court determined that Miles's statements were trustworthy simply because he made them to his friends.

The Ohio Supreme Court's analysis, however, is contrary to *Wright*. Throughout its reasoning, the Ohio Supreme Court did not consider *Wright*'s requirement to examine the "totality of the circumstances" surrounding the out-of-court statement. *See Issa*, 752 N.E.2d at 919. Instead, the Ohio Supreme Court focused only on whether Miles made these statements to the police—this was the determinative factor: "Our decision herein is buttressed by Chief Justice Rehnquist's separate opinion in *Lilly*, in which he noted that in a prior case, the court 'recognized that statements to fellow prisoners, *like confessions to family members or friends*, bear sufficient indicia of reliability to be placed before a jury without confrontation of the declarant.'" *Id.* (internal citation omitted) (quoting *Lilly*, 527 U.S. at 147 (Rehnquist, J., concurring)). By not considering any other facts, the Ohio Supreme Court applied "a preconceived and artificial litmus test" and failed to consider "the totality of the circumstances," which is contrary to what a court "must" do during this analysis. *Wright*, 497 U.S. at 819.

**B. A de novo review of the totality of the circumstances shows that Miles's statements to the Willises are not trustworthy.**

Because we have determined that the Ohio Supreme Court has applied law contrary to Supreme Court precedent, we review de novo whether the out-of-court statements are admissible under the *Roberts* standard. *See Fulcher*, 444 F.3d at 799, 806 (conducting de novo review to conclude that the statements were inadmissible under the *Roberts* standard). Although the Supreme Court has not provided a set list of factors for us to consider, it has described several factors that are relevant to the case before us. For instance, if a statement is spontaneous, then it suggests that the statement is trustworthy. *See Wright*, 497 U.S. at 821. Additionally, when the speaker has consistently repeated the statements, it suggests that the statement is trustworthy. *Id.* When a speaker has a motive to fabricate the statement, however, the statement might not be trustworthy, which can occur when the speaker makes the statements to the police. *See id.* at

821–22; *see also Lee*, 476 U.S. at 544. The declarant's mental state at the time that the statement was made also provides insight into whether the statement is trustworthy. *Wright*, 497 U.S. at 821. In contrast, when a speaker makes the statement to someone other than police, such as a friend or family, the nature of the relationship could suggest that the statement is trustworthy. *Cf. Lilly*, 527 U.S. at 139.

Several facts suggest that Miles's statements to the Willises are trustworthy. For instance, the Willises testified that they were friends with Miles. R. 229-3 (App., Trial Tr. at 1087, 1162–63) (Page ID #9653, 9728–29). Miles, in fact, had lived at the Willises' home for a period of time. *Id.* at 1087 (Page ID #9653). That Miles made the statements about the murders at the Willises' home points towards trustworthiness. *Id.* at 1142 (Page ID #9708). Additionally, by making these statements to friends, Miles did not have a reason to shift blame to Issa. Miles also made these statements voluntarily, and he did not make these statements in response to leading questions. Therefore, several facts suggest trustworthiness.

A deeper examination of the circumstances surrounding Miles's statements, nonetheless, suggests that they are not trustworthy. Bonnie, for example, testified that Miles boasted and bragged frequently, so she did not take him seriously:

> Q.      Dre was talking about killing somebody?
> A.      No. As I said, I did not talk to Dre. Everything that I heard was from my brother. Dre was talking about doing a lot of things and never did it; when I heard it. I said, you know - -
> A.      Dre had a tendency to brag, talk big, right. He came from Chicago. He talked about a lot of things he did.
> Q.      And you didn't necessarily believe all his stories?
> A.      I did but I didn't. To me, that was really no big deal, if he did that's him; if he didn't that's still him.
> Q.      You think it was a big deal that Dre may be bragging about killing two people?
> A.      What's the big deal? As I said, I - -
>
>          . . . .
>
> Q.      When [Miles] was describing to you these cold-blooded killings, what's his attitude? How - -
> A.      He had no remorse at all. He was actually bragging.

Q.    He had no remorse at all?  He was actually bragging?
      He was boasting?
A.    Right.
Q.    He was a big man, a tough guy?
A.    Right.

*Id.* at 1126, 1137–38 (Page ID #9692, 9703–04).  Joshua made similar observations about Miles's demeanor:

Q.    Some time before that shooting happened, did anyone discuss shooting with you?
A.    Yes.
Q.    Who?
A.    Andre Miles.

      . . . .

Q.    And what did Andre Miles say to you?
A.    He said he had to kill somebody for some money and that he was hired by Mike and he asked me did I want to take part in it.  I said he was crazy.

      . . . .

Q.    Did you take him seriously at that point?
A.    No, it went in one ear and out the other.  I got back in the car and left.

      . . . .

Q.    Can you state whether or not Andre Miles ever talked about killing anyone else if they talked?
A.    He joked around with it a lot.  I didn't never take him seriously.  I always knew he was capable of doing it, though.
Q.    What did he joke around about?
A.    He would always joke around, say he killed somebody in Chicago or different places.

*Id.* at 1164–65, 1174–75 (Page ID #9730–31, 9740–41).  Because the Willises stated that they believed Miles often lied and that Miles was bragging, the circumstances of the Willises' specific relationship with Miles suggest that Miles's statements are not trustworthy.

Similarly, Miles's testimony in Linda's trial directly contradicts the statements that he allegedly made to the Willises after the murders:

Q.    Mr. Miles, what is your relationships to the Willises?
A.    Just a friend.

Q.    Good friends of yours?

A.    Just a friend - - associates.

Q.    Associates in what, sir?

A.    I know them.  I mean, I talk to them, I conversate with them.  We speak.
       We hang out.

Q.    What do you hang out doing together?

A.    Drinking.  Whatever.

Q.    Getting high?

A.    Yeah.

       . . . .

Q.    Let's talk about the Willises for a second.  You talked with Bonnie and
       Joshua Willis before you committed this murder, didn't you, sir?

A.    No.

Q.    You had no conversation with them - -

A.    About this incident?

Q.    - - about the fact that you were approached by Ahmad Issa to have  these
       people killed.

A.    No.

Q.    When is the last time that you saw either of the Willises before you killed
       these people?

A.    I don't remember, offhand.

Q.    A week?  A month?  A year?

A.    Probably a couple weeks, maybe a week.

Q.    Did you talk to them after the murder?

A.    Yes.

Q.    How soon after?

A.    The next day.

Q.    And is that when you told Joshua Willis what you had done?

A.    No.

Q.    Is it your testimony that you never told them what you did?

A.    Never told them.

Q.    So certainly you never gave them any information that Linda was involved
       in this murder-for-hire scheme, did you?

A.    No.

R. 228-1 (L. Khriss Trial Tr. at 468–72) (Page ID #8028–32).  Based on this testimony, Miles never discussed the murders with the Willises, which conflicts with Miles's alleged statements to the siblings.  Thus, based on the totality of the circumstances, Miles's statements are not sufficiently trustworthy to warrant their admission in Issa's trial.

**C.  The error was not harmless.**

"[A] constitutional error is cause for federal habeas relief only if it has 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).  "This Court has held that the *Brecht* standard survived the enactment of AEDPA."  *Fulcher*, 444 F.3d at 822. "[T]he proper standard by which to gauge the injurious impact . . . is to consider the evidence before the jury absent the constitutionally infirm evidence."  *Brumley*, 269 F.3d at 646.  There are five factors to consider:  (1) the importance of the out-of-court statements to the prosecution's case; (2) whether the statements are cumulative; (3) whether other evidence materially contradicts or corroborates the out-of-court statements; (4) the amount of cross-examination that occurred; and (5) the strength of the prosecution's case.  *See Madrigal v. Bagley*, 413 F.3d 548, 551 (6th Cir. 2005) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

First, Miles's out-of-court statements were important to the prosecution's case.  The prosecution, for instance, emphasized in its closing that it wanted the jury "to look at . . . Bonnie and Josh's statements because that's where you get the statements of Andre Miles, that's where you find Andre Miles did the shooting."  R. 229-3 (App., Trial Tr. at 1445) (Page ID #10013). Additionally, at the end of closing argument, the prosecution stated that the Willises "provided details to the police that the police didn't have.  Think of that.  They are *the cornerstone* of this investigation."  *Id.* at 1448–49 (Page ID #10016–17) (emphasis added).  Thus, Miles's out-of-court statements were central to the prosecution's case.

Second, Miles's statements are the only direct evidence implicating Issa in a murder for hire.  Hayes, for example, stated that she possibly observed Linda and Issa exchange $2,000, but she also stated that employees regularly helped count and package money.  *See id.* at 846–48 (Page ID #9411–13).  She also said that money was deposited into the store's checking account on November 25, 1997.  *Id.* at 853 (Page ID #9418).  However, Howard and Gammoh each testified that he believed that he saw a rifle in Issa's apartment.  *Id.* at 864–66, 919 (Page ID #9430–32, 9485).  Gammoh's testimony also suggests that Issa might have had time to assist Miles because Issa dropped Gammoh off between 1:14 a.m. and 1:20 a.m. on the night of the

murders and then picked Gammoh up about twenty-five or thirty-five minutes later—Gammoh came up with the calculation of this amount of time because that is how long it took him to finish his beer. *Id.* at 890, 894 (Page ID #9456, 9460). According to Gammoh's testimony, the next day, Issa told Gammoh that the "[n]ext time [the police] ask [Gammoh], tell them that [Issa and Gammoh] were together, you know." *Id.* at 906 (Page ID #9472). Gammoh also stated that he observed Issa take a white trash bag out of Issa's trunk, but he did not know the bag's shape. *Id.* at 916–17 (Page ID #9482–83). Regarding the rifle, an officer testified that the police found one round of 7.62-caliber ammunition in Issa's apartment, but this was from a different manufacturer than the cartridges next to the murder weapon. R. 229-2 (App., Trial Tr. at 765, 777–78) (Page ID #9330, 9342–43). Joshua also stated in court, regarding the rifle in the Willises' backyard, that Issa told Joshua "[o]kay. I'll talk to Andre and if Andre don't come and get it, I will." R. 229-3 (App., Trial Tr. at 1171) (Page ID #9737). Bonnie similarly testified that Issa asked Bonnie to tell Miles to not go to the Save-Way because the police were investigating. *Id.* at 1099 (Page ID #9665). In reviewing this remaining evidence, however, we cannot conclude that Miles's inadmissible statements did not have "a substantial and injurious effect or influence in determining the jury's verdict," so the error was not harmless. *Brecht*, 507 U.S. at 623 (quoting *Kotteakosv v. United States*, 328 U.S. 750, 776 (1946)).

## III. CONCLUSION

Because the admission of Miles's statements violated the Confrontation Clause under then governing Supreme Court law and was not harmless, we **VACATE** and **REMAND** to the district court with instructions to grant a **CONDITIONAL WRIT OF HABEAS CORPUS**, giving the State of Ohio 180 days to retry Issa or to release him from custody. In light of this conclusion, we will not address Issa's additional grounds for relief.

———————————

**CONCURRENCE**

———————————

MERRITT, Circuit Judge, concurring.  I agree and concur in Judge Moore's opinion that the admission of the hearsay testimony of Joshua and Bonnie Willis violated the Confrontation Clause, but the failure to call Linda Khriss as a witness also constituted ineffective assistance of counsel.

Issa was charged with aggravated murder with prior calculation and design and a death specification of murder for hire.  Issa's codefendant, Linda Khriss, facing the same charges as Issa, testified in her own trial and denied hiring anyone to kill her husband.  She specifically exonerated Issa, testifying at her trial that Issa did not conspire to kill her husband.  Linda Khriss Trial Tr. at 101.  She denied the existence of any plan to kill her husband.

> Q.      [A]t any time prior to the death of your husband did you and Ahmad Issa conspire or plan to kill your husband?
> A.      No sir, we never did.

Linda Khriss Tr. Trans. at 86.  Linda Khriss was acquitted.  The state then presented the same theory at Issa's trial that it relied on at Linda's:  Linda hired Issa to kill her husband, and Issa hired Miles to be the triggerman.  Linda Khriss was available to testify at Issa's trial—and in fact sat in the courtroom throughout much of his trial.  Yet trial counsel failed to call her.  Issa therefore did not benefit from the testimony she gave at her own trial.  The failure of Issa's counsel to have Linda testify to disprove Issa's involvement in the murder constitutes ineffective assistance of counsel.

The Sixth Amendment guarantees to a criminal defendant "the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  This right to counsel is "the right to effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell

below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the petitioner's trial. *Id.* at 694.

*Strickland* first directs us to examine whether counsel's performance was deficient, that is, whether it "fell below an objective standard of reasonableness" measured under "prevailing professional norms." *Id.* at 688. The state contends that because counsel's decision not to call Linda was "strategic," it cannot be ineffective. "Strategic" decisions can be unreasonable depending on the circumstances and therefore deficient under *Strickland*. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."). Simply labeling the decision "strategic" is not enough under *Strickland*. "A lawyer who fails adequately to investigate, *and to introduce into evidence*, [information] that demonstrate[s] his client's factual innocence, *or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict*, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) (emphasis added). Therefore, an attorney's failure to present available exculpatory evidence is ordinarily deficient absent some clearly discernible reason. *Stewart v. Wolfenbarger*, 468 F.3d 338, 355-61 (6th Cir. 2006) (trial counsel has been found ineffective when she fails to present exculpatory testimony); *see also Washington v. Murray*, 952 F.2d 1472, 1476 (4th Cir. 1991); *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990); *appeal after remand*, 961 F.2d 113 (8th Cir. 1992) (failure to interview alibi witnesses was deficient performance under first *Strickland* factor); *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) (failure to call witnesses to contradict eyewitness identification of defendant was ineffective assistance).

I cannot perceive any legitimate strategic reason for the failure to present evidence that would show that a jury of twelve had just concluded that Linda was not guilty of the same crime Issa was being tried for. It seems obvious that Linda's testimony would have been helpful to raise reasonable doubt about whether she hired Issa to kill Maher Khriss.

The second *Strickland* prong requires us to determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland*, 466 U.S. at 694. The only testimony directly tying Issa to the murders was the hearsay statement of Miles introduced through Bonnie and Joshua Willis, testimony the state recognized as the "cornerstone" of their case. The Willis' hearsay testimony should not have been admitted; but, once it was, Issa's trial counsel needed to refute it. What better way to disprove the charge than to show that Linda had just been acquitted of the same charge?

The Ohio court failed to reasonably apply *Strickland*. Issa raised the claim of ineffective assistance of counsel in his state post-conviction petition for relief. The Ohio Court of Appeals found, without citing any basis for its conclusion, that because part of Linda's testimony "could be damaging" to Issa, counsel's strategic decision not to call her as a witness was not ineffective assistance. *State v. Issa*, C-000793, 2001 WL 1635592, at *4 (Ohio Ct. App. Dec. 21, 2001), *appeal not allowed for review*, 766 N.E.2d 162 (Ohio 2002) (Table). The Ohio court does not explain the content of the so-called "damaging" testimony given by Linda at her trial. The record in this case reflects only the testimony of an acquitted codefendant who testified in her own defense, denying any plan to kill her husband, as well as explicitly denying that she hired Issa to kill her husband. The Ohio court's speculation about the possibility of Linda's testimony being "damaging" is insufficient to satisfy *Strickland*, *Towns v. Smith*, 395 F.3d 251, 259-60 (6th Cir. 2005) (no support in the record for speculation that the witnesses' testimony would have been damaging to defendant), and is therefore an unreasonable application of Supreme Court law. Even if something in the testimony could be perceived as negative, it was far outweighed by the fact that Linda's testimony disproved the entirety of the state's case and exonerated Issa. The failure to call Linda Khriss as a witness fell below an objective standard of reasonableness, caused harm to Issa and was an unreasonable application of *Strickland*.

There is one final reason that Issa should not be put to death. Even if he contributed in some way to the murder in this case, it is completely irrational to select him for execution while Linda and Miles are spared. The death penalty system has "capriciously" and "freakishly" selected Issa for death just as Justice Stewart described in his concurring opinion in *Furman v. Georgia*, 408 U.S. 238, 309-10 (1972). If the Eighth Amendment is to "draw its meaning from evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356

U.S. 86, 101 (1958), we should not let Issa be executed when the trigger man (Miles) is simply imprisoned.  The State of Ohio does not attempt to explain these inconsistent verdicts.  The irrationality of these inconsistencies is apparent.