DA 19-0257

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 229

STATE OF MONTANA,

       Plaintiff and Appellee,

    v.

RICHARD LEE TOME,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADC-16-643
Honorable Gregory G. Pinski, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Chad Wright, Appellate Defender, Moses Okeyo, Assistant Appellate Defender, Helena, Montana

       For Appellee:

              Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

              Joshua A. Racki, Cascade County Attorney, Carolyn H. Mattingly, Matthew Robertson, Deputy County Attorneys, Great Falls, Montana

Submitted on Briefs:  May 5, 2021

Decided:  September 14, 2021

Filed:

_____
                        Clerk

FILED

09/14/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0257

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Richard Lee Tome was convicted by a jury in the Eighth Judicial District Court, Cascade County, of sexual intercourse without consent. The victim, T.C., was thirteen years old, deaf, and developmentally delayed. On the second day of trial, the State, unsure whether T.C. would be competent to testify, submitted a brief to support its introduction of hearsay testimony from five witnesses who would testify to what T.C. told them. Tome argued that the unavailability of the victim violated his right of confrontation, particularly because his defense was based on T.C.'s credibility and her inconsistent statements. After finding T.C. incompetent, the District Court declared a mistrial and scheduled a second trial. At the second trial, Tome objected to the five witnesses' hearsay testimony. He argued his right of confrontation was violated when his request to interview or depose T.C. prior to trial was denied and when he could not cross-examine T.C. during trial. We reverse, concluding Tome's constitutional right to confront his accusers was violated.

¶2 Although numerous issues are raised on appeal, we address the following dispositive issue:

> *Whether Tome's constitutional right to confront his accuser was violated when the District Court admitted multiple hearsay statements of the victim, including a recorded forensic interview, without Tome having an opportunity to cross-examine her.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Based upon the testimony from the first trial, the testimony of the five hearsay witnesses during the evidentiary hearing to determine their admissibility, and the testimony

and evidence propounded during the second trial, we summarize the factual background as follows.

¶4 On November 3, 2016, T.C., who attended the Montana School for the Deaf and Blind (MSDB), became emotional and distraught in class, necessitating that her teacher take her to the school psychologist, Chris Gutschenritter. In the office, T.C. met with Gutschenritter and Yvette Smail, a behavioral specialist at MSDB, and told each that she wanted to talk about something that happened to her the previous day. T.C. relayed how, on November 2, 2016, a man named "Ricky" came over to her as she sat at the breakfast table in her home and knocked her out of her chair and onto the floor. The man pulled down her pants and T.C. then demonstrated what happened next by using the American Sign Language (ASL) gesture for sexual intercourse. T.C. used the gesture six times while saying "[h]urt, hurt, hurt, bleed, bleed, bleed." T.C., in contrast to her sometimes indirect manner, exhibited "eye-to-eye" contact with Gutschenritter and Smail and "was very serious." It appeared to the counselors that T.C. "wanted to get this out" and "make sure that [they] understood exactly what she was talking about." Gutschenritter and Smail reported T.C.'s disclosure to law enforcement.

¶5 Later that day, Officer John Marshall went to T.C.'s home and spoke with T.C. and her mother, Britanni, who was interpreting for her. Marshall and T.C. communicated through notes, gestures, and sign language. Marshall testified during trial that T.C. told him Tome lived with them[1] and, that when her mother left to do the laundry, Tome

---

[1] Tome paid the landlord rent to park his camper in the parking lot of the apartment complex. He came into the apartment complex to use the restroom and shower.

approached her while she was in her bed and showed her pornographic pictures of men and women having sex. Marshall testified that T.C. told him Tome "touched her left breast, grabbed her vagina, pulled her pants down, and then climbed on top of her, holding her down, and penetrated her vagina with his penis, having sex with her." Marshall testified that T.C. used gestures indicating Tome pulled her pants down and had sexual intercourse. T.C. told Marshall that after the incident she bled and had stomach and vaginal pain. Marshall gathered the bedding, which appeared to have blood stains on them.

¶6 On the night of November 3, 2016, T.C. was taken to the Benefis East Emergency Room for a sexual assault exam. A SANE nurse[2], Kellie Wilborn, observed a laceration in T.C.'s vaginal area, vaginal tenderness, and redness. T.C. was still in pain but was cooperative. Wilborn testified at trial that T.C. told her "[h]e hurt me. He was on top of me. Why would he do that? I'm just a little girl." Wilborn testified that T.C. told her Tome pulled down her pants and had sex with her, threatened her with a spatula, and that the assault happened on the floor. T.C. also told Wilborn that she scratched Tome's arm.

¶7 On November 4, 2016, T.C. was taken to the Department of Public Health and Human Services (DPHHS) for a forensic interview. Kami Stone, a DPHHS child protection specialist, testified that she conducted a forensic interview of T.C. with the assistance of an ASL interpreter. The interview was taped and recorded. Stone testified that T.C. told her a man named Ricky had intercourse with her in the kitchen and that he showed her pictures of people having sex. Stone said T.C. told her what Ricky did was

---

[2] SANE is the acronym for Sexual Assault Nurse Examiner.

4

wrong and that it really hurt. Stone testified that T.C. described Ricky as old with brown and grey hair and said that he lived in her house. On cross-examination, Stone indicated that T.C. incorrectly stated her name was China and that Ricky was tall,[3] but Stone testified that T.C. was clear when she told her that Ricky put his penis in her and used gestures indicating intercourse.

¶8 Officers submitted T.C.'s pink underwear, a pair of sweatpants, and the swab from the SANE examination to the crime lab for testing. Male DNA was recovered from the underwear which did not match Tome, but it was not established that this was the pair of underwear T.C. was wearing when assaulted. Further, there was no testimony that the DNA was from sperm cells and there was no clarification at trial regarding the type of cells or where the cells came from. The DNA evidence was thus inconclusive.

¶9 Tome was later located and brought in for questioning, where he denied the incident occurred. The State charged Tome with sexual intercourse without consent by Information on November 17, 2016. While Tome was incarcerated, he told another inmate, Schoen Andersch, that he was in jail "for having sex without consent with a Jerry's Kid" and that he is going to get away with it "because he used a rubber." Andersch testified that Tome also told him that he showed the girl pictures of people having sexual intercourse. Andersch's testimony of what Tome told him was largely consistent with T.C.'s account of what happened.

---

[3] Tome was five feet three inches tall.

¶10 On October 31, 2017, Tome filed a motion to depose T.C. under § 46-15-201(1)(c), MCA, which permits a deposition of a prospective witness if they are "unwilling to provide relevant information to a requesting party and the witness's testimony is material and necessary in order to prevent a failure of justice." The District Court denied his motion on December 20, 2017, concluding Tome did not meet his burden of demonstrating the victim's testimony was material and necessary to prevent a failure of justice. It also concluded that Tome was entitled to view any pretrial interviews the victim gave to law enforcement and would be able to fully cross-examine T.C. at trial.

¶11 A jury trial was held on April 9 and 10, 2018. On the morning of April 10, the court met with the parties and T.C.'s interpreter prior to T.C. testifying. Before T.C. was sworn in, the State filed a brief in support of its introduction of hearsay testimony from five witnesses describing what T.C. said to them about the offense. The State asserted that if T.C. were declared incompetent because of her developmental delays, she would be unavailable as a witness and the provisions of § 46-16-221, MCA,[4] allowing for admission of hearsay testimony, should be applied. Tome responded that if T.C. was deemed incompetent, then he would move for a mistrial due to the State's inability to meet the requirements of the statute and the State's failure to provide notice as required by the statute. Tome referred to his request to depose T.C. and asserted that if she did not testify at trial, he would be tried without ever having an opportunity to cross-examine her.

---

[4] Section 46-16-221, MCA, pertains to the testimony of third persons in cases of abuse of individuals with developmental disabilities. It also provides criteria to assess the reliability of the proposed testimony and when it may be admitted.

6

Although § 46-16-221(1)(e), MCA, required the State to give "sufficient notice to provide the adverse party with a fair opportunity to prepare[,]" the State maintained that Tome was able to gather information based on the forensic interview with T.C. and the DPHHS specialist (Stone). Tome subsequently asserted that the "distinguishing factor here" was that "without that notice, [he] fully expected to be able to cross-examine [T.C.] under *Crawford v. Washington*, and confront her, let the jury see that, and then do the impeachment of her in the eyes of the jury because this is an attack on credibility." 541 U.S. 36, 124 S. Ct. 1354 (2004). Tome's defense was centered around impeaching T.C. based on the inconsistencies in the statements T.C. made to each of the five witnesses.

¶12 Before T.C. took the stand, the District Court emphasized what needed to be established with respect to T.C.'s competency. "She's been brought here to tell the truth. And it's wrong to lie. And bad things can happen if you lie in a courtroom." T.C. endured a line of questioning centered around distinguishing between a truth and a lie:

Q: [Prosecutor]: If I told you that I'm a girl, is that true?

A: [T.C.]: You're a girl.

Q: If I told you that I don't have hair, is that true?

A: You're a girl.

Q: What about if I told you that this is Anna, is that the truth?

A: Yes. She said that is Elsa.

Q: If I told you this is Anna, is that true?

A: No, that's Anna. This is Elsa. I know – I know their names.

. . . .

7

Q: Is it the right thing to do to tell the truth to us? So what happens when I tell you this is Anna, what happens when I lie to you?

A: I don't lie. My grandma and my mom said I can't lie, and tell the truth.

.   .   .

Q: Have you ever lied at school?

A: No.

.   .   .

Q: So if you lied to me, do you think the Judge would get mad?

A: No.

.   .   .

[Defense counsel]: Your Honor, I'm sorry, but I would just like to say it's a minimal requirement, and yet we've had at least ten questions here about that.

[The court]: I understand

Q: [The court]: [T.C.], [T.C.], I'm a judge. Is my robe black or white?

A: [T.C.]: It's black.

Q: If I said my robe was white, would I be telling the truth?

A: [Interpreter]: She said I don't get the question.

.   .   .

Q: [Prosecution]: So if the Judge told you that I were a girl – would he be telling the truth?

A: [T.C.]: No, he's a boy. I know he's a boy.

¶13    Based on the testimony provided, the court found that T.C. was not competent to

testify. It stated:

> The witness, because of her intellectual and developmental disabilities
> cannot appreciate the difference between a truth and a lie. Most certainly,
> she can appreciate differences between colors or differences between Disney
> characters. But that differentiation between telling the truth and telling a lie,

8

which is paramount to understanding why she is being brought into court, is missing.

Tome once again moved for a mistrial and reasserted his objections. Tome specifically argued that his right of confrontation would be violated if the court were to allow T.C.'s out-of-court statements to come in through the five hearsay witnesses and recorded forensic interview. The court acknowledged the confrontation argument, stating:

> I mean, that's the only thing, too, is that, you know, under the confrontation clause, the forensic interview may very well violate the confrontation clause as opposed to the statements of the medical providers – might be a total different outcome.

¶14 The District Court set a new trial date for August 20, 2018. On June 7, 2018, the court conducted an evidentiary hearing pursuant to § 46-16-220, MCA ("Child hearsay exception–criminal proceedings"), and § 46-16-221, MCA ("Testimony of third persons in cases of abuse of individual with developmental disability"), to determine if the statutory criteria for allowing the otherwise inadmissible hearsay evidence was satisfied. The District Court issued a written order concluding: (1) T.C.'s statements to the school psychologist (Gutschenritter), to the school behavior specialist (Smail), and to the DPHHS child protection specialist (Stone) had circumstantial guarantees of trustworthiness; (2) T.C. was unavailable to testify as a witness at trial; (3) T.C.'s statements to the school psychologist (Gutschenritter), the school behavior specialist (Smail), and the DPHHS child protection specialist (Stone) were more probative than any other evidence; (4) T.C.'s statements were evidence of a material fact; (5) T.C.'s statements to the school psychologist (Gutschenritter), the school behavior specialist (Smail), and the DPHHS child protection specialist (Stone) were nontestimonial in nature since they were

9

made to these individuals in their capacities as counselors and forensic interviewer; and (6) the State gave proper notice of the statements. DNA lab results came back inconclusive and indicated a DNA profile donated by a male contributor; however, the results excluded and eliminated Tome as a contributor of the profile. The District Court acknowledged no witnesses and no physical evidence linked Tome to the incident; however, it explained the hearsay evidence was "evidence of a material fact."

¶15 The District Court granted Tome's motion to continue and set a new trial date for December 3, 2018. At the outset of trial, Tome reiterated his objection to any hearsay testimony and reasserted his constitutional right of confrontation was violated. The school psychologist (Gutschenritter), the school behavior specialist (Smail), Officer Marshall, the SANE nurse (Wilborn), and the DPHHS child protection specialist (Stone) testified about what T.C. told them Tome did. T.C. did not testify. The State also introduced the forensic interview of T.C. with the DPHHS specialist (Stone) and her ASL interpreter. The jury returned a verdict of guilty.

¶16 Tome's appeal asserts that T.C.'s statements to Officer Marshall, the DPHHS child protection specialist (Stone), and the SANE nurse (Wilborn) were testimonial, and that any admission of these hearsay statements violated his constitutional right of confrontation provided by the Sixth Amendment of the United States Constitution and *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004).

**STANDARDS OF REVIEW**

¶17 This Court reviews a trial court's conclusions of law and its interpretation of statutes de novo for correctness. *State v. Henderson*, 2015 MT 56, ¶ 9, 378 Mont. 301,

343 P.3d 566. This Court's review of constitutional questions is plenary and we therefore review de novo a district court's interpretation of the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution. *State v. Stock*, 2011 MT 131, ¶16, 361 Mont. 1, 256 P.3d 899.

## DISCUSSION

¶18 Preliminarily, we address the State's assertion that Tome's Confrontation Clause challenge and reliance on *Crawford* was not raised at trial and was therefore not properly preserved for appeal. The State argues that Tome's general reference to the Confrontation Clause was insufficient to preserve his argument that admitting T.C.'s statements to the forensic interviewer (Stone), Officer Marshall, and the SANE nurse (Wilborn) violated his right of confrontation.

¶19 When the State submitted its brief on the second day of the first trial indicating its intent to introduce hearsay testimony if T.C. was found incompetent to testify, Tome objected on the basis that allowing these hearsay statements into evidence would violate his right of confrontation as explained in *Crawford*, particularly because his defense was based on impeaching T.C. with the inconsistencies in the numerous statements she gave. Tome explained that he could not use these statements to impeach T.C. if she did not testify and asserted that admitting the testimonial hearsay evidence would violate his right of confrontation. Tome reminded the court that his earlier request to depose T.C. had been denied on the basis that T.C. would be present at trial and able to testify. A review of the record demonstrates that the court understood Tome's objection was rooted in a

11

Confrontation Clause violation; indeed, the court itself questioned whether admitting the forensic interview recording might violate Tome's right of confrontation:

> I mean, that's the only thing, too, is that, you know, under the confrontation clause, the forensic interview may very well violate the confrontation clause as opposed to the statements of the medical providers – might be a total different outcome.

At the beginning of the second trial, Tome again objected, stating:

> Again, Your Honor, I just want to make clear we object to any hearsay of the complaining witness to come in. We believe it's a due process and confrontation violation under *State v. White Water* [citations omitted]. I understand we went through this before. We just want to renew that. We think we have a right to confront. She made a number of statements we do not feel are consistent and therefore trustworthy. And I will be renewing this motion when the witnesses take the stand to testify and at the end of the State's case. Thank you.

During Officer Marshall's testimony, just before he testified about what T.C. told him, defense counsel again objected on the basis that Officer Marshall's hearsay testimony would violate Tome's right of confrontation. The court responded: "I've already addressed that. It's overruled."

¶20 It is clear from the record that Tome objected to the admission of T.C.'s hearsay statements on the basis that he would be unable to confront her about inconsistencies. Tome's objections were fundamentally tethered to, and rooted in, a Confrontation Clause violation, and he articulated as much on several occasions. Importantly, "[i]f the court were limited to the arguments and reasoning of counsel in its decisions of cases, to the exclusion of our own observations, many cases would lead us far from what we understand to be the true object of the court." *Kudrna v. Comet Corp.*, 175 Mont. 29, 51, 572 P.2d 183, 195 (1977) (quoting *Big Creek Stone Co. v. Seward*, 144 Ind. 205, 43 N.E. 5 (Ind. 1896)).

12

While perhaps, as the State suggests, Tome could have developed his Confrontation Clause objections better, there remains the overriding obligation of this Court to acknowledge and protect the substantial rights of litigants. Here, Tome asserted a violation of his right of confrontation when T.C. was not available to cross-examine either before or during trial. Tome's Confrontation Clause violation is not a new theory on appeal, and appellate counsel has merely bolstered the legal basis upon which Tome objected at trial. "[I]t is evident that in the same way which we are not bound to render decisions based solely on the reasoning offered by appellate counsel, our review is not necessarily restricted by trial counsel's failure to preserve a specification of error for appeal." *State v. Carter*, 2005 MT 87, ¶ 14, 326 Mont. 427, 114 P.3d 1001.

¶21    Moreover, "we have permitted parties to bolster their preserved issues with additional legal authority or to make further arguments within the scope of the legal theory articulated to the trial court." *State v. Montgomery*, 2010 MT 193, ¶ 12, 357 Mont. 348, 239 P.3d 929. *See also Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 18, 345 Mont. 368, 191 P.3d 435 ("While some specific arguments Becker offers on appeal were not offered in the District Court, we cannot conclude that Becker's overall theory or claim has significantly changed."); *Whitehorn v. Whitehorn Farms, Inc.*, 2008 MT 361, ¶ 23, 346 Mont. 394, 195 P.3d 836 ("[W]e conclude that [Whitehorn's] appellate argument, while clearly a change in emphasis, is not an entirely new theory, and that excluding consideration of his arguments would be an unduly harsh application of the rule."); *Sleath v. West Mont. Home Health Servs., Inc.*, 2000 MT 381, ¶ 35, 304 Mont. 1, 16 P.3d 1042 ("Indeed, we have decided issues based on cases neither side cited.");

*State v. Morrison*, 2008 MT 16, ¶¶ 10-12, 341 Mont. 147, 176 P.3d 1027 ("Moreover, whether we consider the thirteen-month sentence and five-year sentence as separate and consecutive or as a combined sentence, they arise out of the same sentencing order for the same underlying offense, and therefore, the jurisdictional issue Morrison raises on appeal remains and must be addressed."); *Thomas v. Northwestern Nat'l Ins. Co.*, 1998 MT 343, ¶ 22, 292 Mont. 357, 973 P.2d 804 ("Although . . . the statutory obligation was not raised in the District Court, the appellants alleged in their complaint that the insurer had a duty to notify its insureds of the policy change. The statutory basis simply represents further legal support of such a duty and does not raise a new theory of liability on appeal.").

¶22 This Court is not willing to overlook our overriding obligation to protect the substantial rights of litigants when the basis for the objection was clear to the litigants and the trial court. Tome's confrontation claim is properly preserved for our review. We turn now to whether the admission of hearsay testimony from three witnesses violated Tome's constitutional right to confront his accuser.

¶23 The Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee a criminal defendant the right to confront or face the witnesses against him. *Crawford*, 541 U.S. at 42, 124 S. Ct. at 1359. The essential purpose of the right to confront witnesses is to secure the opportunity to test witnesses' testimony through cross-examination. *State v. Baker*, 2013 MT 113, ¶ 18, 370 Mont. 43, 300 P.3d 696. The United States Supreme Court, in 2004, held that testimonial hearsay statements of witnesses absent from trial are inadmissible under the Confrontation Clause unless the declarant is unavailable and *the defendant had a prior opportunity for*

14

*cross-examination*. *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374 (emphasis added). "Testimony" is typically "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. Although the *Crawford* Court did not provide a definitive definition of "testimonial," it did state that prior testimony and police interrogations are included in testimonial evidence. *Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364.

¶24     In *Davis v. Washington*, the Supreme Court adopted the "primary purpose" test to help ascertain whether a statement is testimonial or nontestimonial. 547 U.S. 813, 822, 126 S. Ct. 2266, 2273 (2006). The Court held that, at a minimum, statements may be nontestimonial when made under circumstances that indicate that the primary purpose was to enable police assistance to meet an ongoing emergency. *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273. Conversely, the Court held that statements may be testimonial when the circumstances objectively indicate that no ongoing emergency exists, and the primary purpose is to establish or prove past events for future criminal prosecution. *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273-74. The Court built on the "primary purpose" test in *Michigan v. Bryant*, emphasizing that the inquiry must consider "all of the relevant circumstances." 562 U.S. 344, 369, 131 S. Ct. 1143, 1162 (2011). The Court noted that the "existence *vel non* of an ongoing emergency" is not dispositive, but "simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant*, 562 U.S. at 366, 131 S. Ct. at 1160. An additional factor in the analysis is the "informality of the situation and the interrogation." *Bryant*, 562 U.S. at 377, 131 S. Ct. at 1166. Further clarifying the analysis, the Court noted that, in addition to the

15

circumstances of the encounter, "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Bryant*, 562 U.S. at 367, 131 S. Ct. at 1160.

¶25 The Court applied the *Davis/Bryant* framework in *Ohio v. Clark*, 576 U.S. 237, 135 S. Ct. 2173 (2015), a case that appears apposite to the instant case, but, upon thorough review, remains distinguishable. In *Clark*, preschool teachers asked a three-year-old child about injuries on his body while at the preschool. 576 U.S. at 241, 135 S. Ct. at 2178. The child named Clark as his abuser, and Clark was indicted on several counts relating to the child's injuries. *Clark*, 576 U.S. at 241, 135 S. Ct. at 2178. At trial, the child was found not competent to testify, but the trial court admitted his statements to his teachers under Ohio's hearsay exception for child statements in abuse cases. *Clark*, 576 U.S. at 241-42, 135 S. Ct. at 2178. The state appellate court reversed on Confrontation Clause grounds and was affirmed by the Supreme Court of Ohio. *Clark*, 576 U.S. at 242, 135 S. Ct. at 2178. On appeal, the United States Supreme Court reversed. The Court concluded that, considering all relevant circumstances, the child's statements "clearly were not made with the primary purpose of creating evidence for Clark's prosecution." *Clark*, 576 U.S. at 246, 135 S. Ct. at 2181. The Court noted that the child's statements "occurred in the context of an ongoing emergency involving suspected child abuse." *Clark*, 576 U.S. at 246, 135 S. Ct. at 2181. The "first objective" of the conversation was not to prosecute Clark, but to protect the child, and the conversation between the child and his teachers "was informal and spontaneous" and "nothing like the formalized station-house questioning in *Crawford* . . . ." *Clark*, 576 U.S. at 247, 135 S. Ct. at 2181. The Court also

16

noted that the child's "age fortifies our conclusion that the statements . . . were not testimonial" and that "[f]ew preschool students understand the details of our criminal justice system." *Clark*, 576 U.S. at 247-48, 135 S. Ct. at 2181-82. Finally, the Court's analysis noted that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers" and the fact that the statements were made to the child's teachers "remains highly relevant." *Clark*, 576 U.S. at 249, 135 S. Ct. at 2182.

¶26 Preliminarily, the dissent misrepresents *Clark*'s analysis of the witness's age. In doing so, the dissent appears to imply that *Clark* held that statements by very young children *never* implicate the Confrontation Clause because young children lack an understanding of the criminal justice system, and therefore, hearsay statements by children are *always* admissible. The *Clark* Court stopped far short of such a categorical rule. The Court's conclusion that the child's statements were nontestimonial relied on a thorough analysis of the primary purpose test. *Clark*, 576 U.S. at 246-48, 135 S. Ct. at 2181-82. The age of the witness in *Clark* was not dispositive, but merely "fortifie[d]" the Court's conclusion, after consideration of all the circumstances, that statements made to the three-year-old's teachers were nontestimonial. *Clark*, 576 U.S. at 247-48, 135 S. Ct. at 2181-82.

¶27 Here, T.C.'s competency does not prove dispositive. Her initial report to Gutschenritter and Smail led them to report T.C.'s disclosure to law enforcement. At the time of Gutschenritter and Smail's report, the record contains no evidence of an ongoing

17

emergency or concerns for T.C.'s safety. After that report, T.C. spoke to Officer Marshall, SANE nurse Wilborn, and participated in a forensic interview with DPHHS child protection specialist Stone. The encounters with Officer Marshall, Wilborn, and Stone came 24 to 48 hours after the alleged crime, well after any potential ongoing emergency. The circumstances of each interview support a finding that the primary purpose was to gather evidence for a prosecution, and nothing suggests that the encounters were "informal and spontaneous" as in *Clark*. 576 U.S. at 247, 135 S. Ct. at 2181. While Officer Marshall interviewed T.C. at her home, the encounter came after Gutschenritter and Smail filed a report, and Officer Marshall's intent was to investigate that report. As a result of Officer Marshall's investigation, Wilborn conducted a sexual assault examination of T.C. at the emergency room to gather evidence for the investigation.[5] T.C.'s forensic interview with Stone arose from the necessity to investigate the report and occurred at the DPHHS office with law enforcement observing the interview from a separate room. The objective intent of each party indicates that the primary purpose was to gather evidence for a prosecution. Officer Marshall was investigating a report of child abuse as a member of law enforcement. Wilborn, as a SANE nurse, gathered evidence of T.C.'s condition for future criminal prosecution. Stone, as a forensic interviewer, testified that she intended to turn the interview over to law enforcement for placement into evidence. While T.C. was

---

[5] Whether a SANE nurse interview constitutes a testimonial or nontestimonial statement remains debated and context-specific. *See, e.g., Kansas v. Miller*, 293 Kan. 535, 562-65, 264 P.3d 461 (Kan. 2011) (collecting cases involving statements made by a victim to a SANE nurse or other medical professional). Wilborn's testimony that her duties are "primarily collecting evidence" supports our conclusion that T.C.'s statements to her were testimonial.

18

found not competent to testify, the record indicates that T.C. had previously called law enforcement on her parents and therefore possessed at least some awareness of the purpose of law enforcement. The "fortif[ying]" reasoning in *Clark* that, due to their age, "[f]ew preschool students understand the details of our criminal justice system[,]" does not apply here. *Clark*, 576 U.S. at 247-48, 135 S. Ct. at 2181-82. Finally, we note that, inapposite to *Clark*, T.C.'s statements at issue here were made to law enforcement and other entities tasked with assisting in criminal prosecutions—not to her teachers or acquaintances. T.C.'s competency proves irrelevant to our conclusion: her statements were undoubtedly made for the primary purpose of furthering Tome's prosecution.

¶28     Some important principles are set forth in *Crawford*. First, the Confrontation Clause only applies to testimonial statements, leaving the remainder to regulation by state hearsay laws. *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374. Second, *Crawford* unequivocally held that, when testimonial statements are at issue, "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U.S. at 68-69, 124 S. Ct. at 1374. The Court explained:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge [pursuant to statutory or judicially created exceptions] is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on

19

which there could be little dissent), but about how reliability can best be determined.

*Crawford*, 541 U.S. at 61, 124 S. Ct. at 1370. The Court explained that when a jury hears evidence untested by the adversary process, based on a "mere judicial determination of reliability," the constitutionally prescribed method of assessing reliability is replaced with a wholly foreign one. *Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370. "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." *Crawford*, 541 U.S. at 62, 124 S. Ct. at 1371. The Court in *Crawford* explained that state hearsay laws that provide open-ended balancing tests do violence to the design of the categorical constitutional guarantee provided in the Confrontation Clause. *Crawford*, 541 U.S. at 67-68, 124 S. Ct. at 1374. The Court also examined the historical record of the Sixth Amendment, concluding that the record supports the proposition that "the Framers would not have allowed admission of testimonial statements" if a witness was unavailable to testify and the defendant had no prior opportunity for cross-examination. *Crawford*, 541 U.S. at 53-54, 124 S. Ct. at 1365. The Court rejected the argument that the text of the Sixth Amendment allowed for "open-ended exceptions" and concluded that the "requirement" to cross-examine was "dispositive." *Crawford*, 541 U.S. at 54-55, 124 S. Ct. at 1366-67. In conclusion, the *Crawford* Court held:

> Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.

20

*Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374.

¶29 Pre-*Crawford*, Confrontation Clause analysis for both testimonial and nontestimonial statements focused on whether the evidence contained sufficient indicia of reliability. *Idaho v. Wright*, 497 U.S. 805, 814-15, 110 S. Ct. 3139, 3146 (1990). Sufficient indicia of reliability arose from either a "firmly rooted hearsay exception" or "a showing of particularized guarantees of trustworthiness." *Wright*, 497 U.S. at 815, 110 S. Ct. at 3146; *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539 (1980) (overruled by *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004)). The *Wright* Court opined, in dicta, that "the Confrontation Clause does not erect a per se rule barring the admission of prior statements of a declarant who is unable to communicate to the jury at the time of trial." *Wright*, 497 U.S. at 825, 110 S. Ct. at 3151. *Wright*'s central holding expanded *Roberts* slightly to hold that sufficient indicia of reliability may be determined from the totality of the circumstances, but otherwise applied the *Roberts* approach. *Wright*, 497 U.S. at 816, 819-20, 110 S. Ct. at 3147, 3149.

¶30 *Crawford*'s "requirement" for cross-examination was "dispositive." *Crawford*, 541 U.S. at 54-55, 124 S. Ct. at 1366-67. To the extent that the *Crawford* Court neglected to address *Wright*, this omission rests on one key distinction between *Wright* and *Roberts*. The *Roberts* Court expressly rejected the contention that the Confrontation Clause required cross-examination, instead conditioning the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S. Ct. at 2539. Under that

21

analysis, the *Roberts* Court concluded that the trial court properly admitted the hearsay evidence in question. 448 U.S. at 73-74, 100 S. Ct. at 2542-43. While *Crawford* does not apply retroactively, *see Whorton v. Bockting*, 549 U.S. 406, 421, 127 S. Ct. 1173, 1183-84 (2007), the Court's holding in *Crawford* remains patently incompatible with *Roberts*. Conversely, the *Wright* Court concluded that, applying *Roberts* and viewing the totality of the circumstances, the admission of the evidence in question violated the Confrontation Clause because it lacked sufficient particularized guarantees of trustworthiness. *Wright*, 497 U.S. at 826-27, 110 S. Ct. at 3153. The Court affirmed the judgment reversing conviction. *Wright*, 497 U.S. at 827, 110 S. Ct. at 3153.

¶31    *Wright* simply did not require overruling as *Roberts* did.[6] The United States Supreme Court "does not overturn its precedents lightly." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798, 134 S. Ct. 2024, 2036 (2014). *Stare decisis* "has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up." *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 455, 135 S. Ct. 2401, 2409 (2015). The "cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more." *Morse v. Frederick*, 551 U.S. 393, 431, 127 S. Ct. 2618, 2641 (2007) (Breyer, J., concurring in the judgment in part and dissenting in part). Despite applying *Roberts*, the *Wright* Court reached the same conclusion that the *Crawford* Court would have reached: the evidence in question was

---

[6] Other jurisdictions have reached a different conclusion. *See Bruce v. Wyoming*, 2015 WY 46, ¶ 45, n. 3, 346 P.3d 909 (Wyo. 2015) ("*Crawford* overruled *Wright* and *Ohio v. Roberts* . . . by holding that testimonial statements were not admissible even if they were reliable[.]").

inadmissible. Overruling *Wright*, then, proved unnecessary and would have amounted to invalidating the correct decision simply because it applied the applicable test at that time. It was unnecessary to decide more than the question before the *Crawford* Court, which required addressing *Roberts*. Moreover, regardless of any perceived tensions between *Wright* and *Crawford*, the decision of which analysis to apply is not ours. If a Supreme Court precedent has "direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," lower courts "should follow the case which directly controls" and leave to the Supreme Court "the prerogative of overruling its own decisions." *Hurst v. Florida*, 577 U.S. 92, 101, 136 S. Ct. 616, 623 (2016). *Wright* fails both tests. The evidence in question is testimonial in nature, leaving *Wright* with no direct application to this case, and more importantly, *Wright*'s reasoning rests on *Roberts*, which *Crawford* thoroughly and categorically repudiated. Conversely, *Crawford* has direct application to testimonial evidence and contains no such fundamental flaw underlying its reasoning.

¶32    In *Ohio v. Clark*, Justice Scalia concurred in the judgment and elaborated at length regarding the "shoveling of fresh dirt upon the Sixth Amendment right of confrontation so recently rescued from the grave" in *Crawford*. 576 U.S. 237, 252, 135 S. Ct. 2173, 2184 (2015) (Scalia, J., with Ginsburg, J., concurring in the judgment). *Crawford* "sought to bring our application of the Confrontation Clause back to its original meaning, which was to exclude unconfronted statements made by *witnesses—i.e.*, statements that were *testimonial*." *Clark*, 576 U.S. at 252, 135 S. Ct. at 2184 (Scalia, J., with Ginsburg, J., concurring in the judgment) (emphasis in original). Indeed, *Crawford* rejected the

23

'adequate indicia of reliability' inquiry long used to judge the admissibility of hearsay evidence as "*inherently*, and therefore, *permanently,* unpredictable." *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374, n. 10 (emphasis in original). In his concurrence in *Clark*, Justice Scalia explained that *Crawford* "remains the law" and constituted neither a "different approach" nor "a matter of twiddle-dum twiddle-dee preference," but rather "the categorical overruling, the thorough repudiation, of an earlier line of cases . . . ." *Clark*, 576 U.S. at 252, 135 S. Ct. at 2184 (Scalia, J., with Ginsburg, J., concurring in the judgment). Pertinently, Justice Scalia, the author of the majority opinion in *Crawford*, noted that:

> Defendants may invoke their Confrontation Clause rights once they have established that the state seeks to introduce testimonial evidence against them in a criminal case without availability of the witness and a previous opportunity to cross-examine. The burden is upon the prosecutor who seeks to introduce evidence *over* this bar to prove a long-established practice of introducing *specific* kinds of evidence, such as dying declarations…for which cross-examination was not typically necessary.

*Clark*, 576 U.S. at 253, 135 S. Ct. at 2185 (Scalia, J., with Ginsburg, J., concurring in the judgment) (emphasis in original).

¶33 In this Court's first post-*Crawford* decision, we clarified that *Crawford* "disallow[ed] the use of hearsay exceptions based on indicia of reliability" to admit testimonial hearsay statements. *State v. Mizenko*, 2006 MT 11, ¶ 31, 330 Mont. 299, 127 P.3d 458. The Court took the position that "statement[s] made by the victim of a crime to a friend, family member or acquaintance and describing the crime . . . are nontestimonial unless the declarant had clear reason to believe that they will be used prosecutorially." *Mizenko*, ¶ 30. We later adopted the *Clark* "primary purpose" test to determine whether

24

proffered statements are testimonial or nontestimonial. *State v. Porter*, 2018 MT 16, ¶ 23, 390 Mont. 174, 410 P.3d 955. Regardless of that analysis, the *Mizenko* Court recognized that, "[i]n the wake of *Crawford*, nontestimonial hearsay is analyzed pursuant to the *Roberts* reliability standard, or simply to ensure compliance with the rules of evidence." *Mizenko*, ¶ 31. Should the Court's inquiry determine that a statement is nontestimonial, the *Roberts/Wright* test of adequate indicia of reliability, as required by the rules of evidence, applies. If the Court's inquiry concludes the statement is testimonial, *Crawford* applies, not *Roberts* or *Wright*.

¶34 Finally, while it remains true that courts cite to pre-*Crawford* jurisprudence, such instances prove easily distinguishable. *Crawford* plainly and unambiguously applies only to *testimonial* evidence. *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ."). Cases citing *Wright* often do so for the principle that *nontestimonial* evidence with sufficient indicia of reliability does not violate the Confrontation Clause. *See Issa v. Bradshaw*, 904 F.3d 446 (6th Cir. 2018) (applying *Wright* and concluding that the admission of a pre-arrest, out-of-court confession to the defendant's friends lacked sufficient indicia of reliability and violated the Confrontation Clause); *Sampson v. Grace*, 2007 U.S. Dist. LEXIS 99672 (E.D. Pa.) (applying *Wright* and concluding that the admission of pre-arrest statements made by the victim and defendant to friends did not violate the Confrontation Clause); *Ramirez v. Dretke*, 398 F.3d 691, 696 (5th Cir. 2005) (applying *Wright* and concluding that non-custodial, out-of-court statements made by the declarant to a friend did not violate the

Confrontation Clause); *Hobgood v. Epps*, 2011 U.S. Dist. LEXIS 35573 (S.D. Miss.) (applying *Roberts/Wright* to the admission of nontestimonial statements); *Husbands v. City of New York*, 2007 U.S. Dist. LEXIS 61042 (S.D.N.Y.) (citing *Wright* for its discussion on the excited utterance hearsay exception). *Wright*, undoubtedly, still has some application—for nontestimonial statements. This is not a matter of "twiddle-dum twiddle-dee preference." *See Clark*, 576 U.S. at 252, 135 S. Ct. at 2184 (Scalia, J., with Ginsburg, J., concurring). Certainly, in cases involving *nontestimonial* evidence, the *Wright*/*Roberts* approach may apply. However, in cases such as this, where *testimonial* evidence is at issue, this Court remains bound by *Crawford*.

¶35 The testimony from Officer Marshall, SANE nurse Wilborn, and DPHHS child protection specialist Stone were testimonial in that they were conducted as part of a police investigation where there was no "on-going emergency, and . . . the primary purpose of the investigation was to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74 (2006). They are inadmissible absent a prior opportunity for cross-examination of T.C. While Tome had the opportunity to cross-examine those who read or reiterated what T.C. told them, he did not have the opportunity to cross-examine T.C. about the out-of-court statements she made. Tome was denied a pretrial deposition and T.C. did not testify at trial. Because *Crawford* requires the prior opportunity to cross-examine T.C. before her testimonial statements can be admitted when she is unavailable for cross-examination, we conclude the District Court erred when it allowed the jury to hear testimonial statements of T.C. from these three witnesses.

¶36    The State asserts even if T.C.'s statements were testimonial and admitted through the three witnesses, the statements were harmless. As this Court has stated:

> [I]n order to prove that trial error was harmless, the State must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction. To do this the State must demonstrate that the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence and, qualitatively, by comparison, the tainted evidence would not have contributed to the conviction. . . . [T]hen we must determine whether the tainted evidence went to the proof of an element of the crime charged or, by contrast, to some fact not involving an element of the crime. If there was no cumulative evidence presented as to a fact proving an element of the crime charged, then the error in admitting the tainted evidence which proved that element cannot be considered harmless, the qualitative assessment is never reached, and the court's decision will be reversed. If the evidence in question did not prove an element of the crime, then the State must demonstrate that, qualitatively, there is no reasonable possibility that the tainted evidence might have contributed to the defendant's conviction.

*State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 735.

¶37    The testimony provided by the State's witnesses—Officer Marshall, the DPHHS specialist (Stone), and the SANE nurse (Wilborn)—attested to T.C.'s out-of-court statements about how Tome assaulted and raped her. These three witnesses had specialized training in the field they were testifying about. Their narratives were graphic and provided details not otherwise testified to by other witnesses. The final piece of evidence the jury heard was from T.C. herself, in the form of a recorded interview, in which she struggled to relay the tragedy that had allegedly befallen her. The jury heard from T.C.'s own lips how Tome had abused her, they saw her gestures, they observed her demeanor, and the video was a powerful presentation of the State's complaining witness—a witness who was out-of-reach and unavailable for cross-examination. We have little doubt that,

27

qualitatively, the testimony from the three witnesses alone and the recorded DPHHS interview contributed to the conviction of Tome. Tome has not raised an objection to the testimony of Gutschenritter or Smail and we therefore will not address whether the District Court correctly assessed their reliability under §§ 46-16-220, -221, MCA. The State has failed to meet its burden of demonstrating how the introduction of T.C.'s out-of-court statements through testimony and video was harmless.

## CONCLUSION

¶38    Tome's constitutional right of confrontation was violated because testimony from three witnesses about the out-of-court statements of T.C. was admitted during his trial without Tome having a prior opportunity to cross-examine T.C. The error, given the quality of the testimony, was not harmless. Tome's conviction is reversed and remanded for a new trial.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

Justice Jim Rice, dissenting.

¶39    The Court has provided the general framework of analysis for the Confrontation Clause adopted by the United States Supreme Court in *Crawford*, and I take no issue with the Court's analysis itself. However, I believe the *Crawford* framework, of necessity and

28

under precedent, cannot apply to all confrontation issues, and that this case presents an exception thereto.

¶40    Often quoted is *Crawford*'s use of the term "absolute bar" in summarizing its rule, that is, that the Confrontation Clause imposes "an *absolute bar* to statements that are testimonial, absent a prior opportunity to cross examine." *Crawford*, 541 U.S. at 61, 124 S. Ct. at 1370 (emphasis added). It is notable to me that the Supreme Court used that term to describe, not its holding, but the recommendations others had made regarding development of Confrontation Clause jurisprudence. *See Crawford*, 541 U.S. at 61, 124 S. Ct. at 1370. To be sure, the Supreme Court was clear that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination," and that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination[,]" thus overruling the *Ohio v. Roberts* reliability rule. *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374. Therefore, it may not immediately appear significant that the Supreme Court did not actually use the term "absolute bar" to describe its holding in *Crawford*, but given the Supreme Court's broader jurisprudence, I believe it is.

¶41    The Concurring Opinion in *Crawford* may be more to blame for creating the impression the Supreme Court was adopting an absolute rule in *Crawford*. Chief Justice Rehnquist's Concurrence, joined by Justice O'Connor, agreed the Confrontation Clause had been violated in that case, requiring reversal of Crawford's conviction. *Crawford*, 541 U.S. at 76, 124 S. Ct. at 1378 (Rehnquist, C.J., concurring). However, the Concurring

29

Justices expressed serious concerns[1] about what they perceived was the Majority's overbroadly formulated rationale, stating it "categorically requires the exclusion of testimonial statements" and creates an unprecedented "immutable category of excluded evidence," offering that, "[i]t is one thing to trace the right of confrontation back to the Roman Empire; it is quite another to conclude that such a right *absolutely excludes* a large category of evidence." *Crawford*, 541 U.S. at 72-75, 124 S. Ct. at 1376-78 (Rehnquist, C.J., concurring) (emphasis added). The Concurrence provided from history and the Court's jurisprudence the narrow yet definite circumstances under which testimonial statements were held to be admissible, despite the absence of cross examination, such as dying declarations, and offered, "[i]t is an odd conclusion indeed to think that the Framers created a cut-and-dried rule with respect to the admissibility of testimonial statements when the law during their own time was not fully settled." *Crawford*, 541 U.S. at 73, 124 S. Ct. at 1377 (Rehnquist, C.J., concurring). Citing *Wright*, 497 U.S. at 820-24, 110 S. Ct. at 3149-51 (1990), as providing the proper analytical approach to the Confrontation Clause issue before them, the Concurring Justices joined the Majority in the result on the basis of *Wright*. *Crawford*, 541 U.S. at 76, 124 S. Ct. at 1378 (Rehnquist, C.J., concurring).

¶42     Significant to me is what the *Crawford* Majority did *not* do or say in response to the Concurrence's reliance upon *Wright*. Despite the Concurrence's raising of that precedent as the proper authority for resolution of *Crawford*, the Majority did not overrule or even

---

[1] In fact, although concurring in the outcome, they used the term "dissent" to describe their disagreement with the Majority's "new interpretation of the Confrontation Clause." *Crawford*, 541 U.S. at 69, 124 S. Ct. at 1374 (Rehnquist, C.J., concurring).

mention *Wright*, in stark contrast to the Majority's utter demolition of *Roberts* as inconsistent with the Confrontation Clause. On this point there was unanimous agreement: the Majority did not overrule *Wright* and the Concurring Justices did not complain that it had been, as they did about *Roberts*. Allowing *Wright* to facially remain good law may have occurred for various reasons. Justice Scalia, the author of and primary progenitor of the originalist approach undergirding *Crawford*, was part of the 5-4 Majority in *Wright*, unlike *Roberts*, which was decided in 1980 before he joined the Supreme Court. Another reason, more important for this case, is that *Wright* addressed additional circumstances, not present in *Crawford*, in which a rule of absolute exclusion under the Confrontation Clause would not be appropriate. Those circumstances are at issue in the case now before this Court. *Wright* has since been relied upon. *See Issa v. Bradshaw*, 904 F.3d 446, 454 (6th Cir. 2018) (post-*Crawford* citation to *Wright* as providing a basis for admission of testimony under the Confrontation Clause, which it described as "not a slack requirement"); *Husbands v. City of New York*, 2007 U.S. Dist. LEXIS 61042 (S.D.N.Y.) (post-*Crawford* citation to *Wright*); *Sampson v. Grace*, 2007 U.S. Dist. LEXIS 99672 (E.D. Pa.) (same); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) (same); *Hobgood v. Epps*, 2011 U.S. Dist. LEXIS 35573, 12-13 (S.D. Miss.) (citing *Wright* as "recognizing that hearsay statements admitted under a 'firmly rooted' hearsay exception, such as the excited utterance and dying declaration exceptions, possess particularized guarantees of trustworthiness which do not offend the guarantees of the Confrontation Clause").

¶43    *Crawford* involved the recorded statement of the accused's wife to police, played in the accused's trial for "stab[bing] a man who allegedly tried to rape" her, which provided

31

her account of witnessing the stabbing. *Crawford*, 541 U.S. at 38, 124 S. Ct. at 1356. The accused's wife did not testify at trial under the marital privilege, and thus the accused "had no opportunity for cross-examination" of his wife. *Crawford*, 541 U.S. at 38, 124 S. Ct. at 1357. *Wright* involved a 2-and-1/2-year-old girl who had been held down by Wright, her mother, while a man engaged in sexual intercourse with the child. Pertinent here, after an examination to determine whether the child, then three years old, was capable of testifying at trial, the trial court found that she was "not capable of communicating to the jury." *Wright*, 497 U.S. at 808-809, 110 S. Ct. at 3143.

¶44 The Supreme Court reversed Wright's conviction because the child's hearsay statements made to the examining pediatrician were improperly admitted during the pediatrician's trial testimony. *Wright*, 497 U.S. at 808-809, 110 S. Ct. at 3143. However, the Confrontation Clause error identified in *Wright* was not the absence of opportunity for cross-examination; cross-examination of a witness incapable of testifying can serve no legitimate purpose. The confrontation error in *Wright* was that the child's statements had been admitted upon an incorrect foundation of trustworthiness, primarily on corroborative evidence. *See Wright*, 497 U.S. at 823, 110 S. Ct. at 3150 (determining that "the use of corroborating evidence . . . would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility").[2]

---

[2] We noted these distinctions and their possible impacts upon our precedent in *State v Spencer*, 2007 MT 245, ¶ 33, 339 Mont. 227, 169 P.3d 384.

¶45 Nonetheless, the Supreme Court made clear that "the Confrontation Clause does not erect a *per se* rule barring the admission of prior statements of a declarant *who is unable to communicate to the jury at the time of trial*." *Wright*, 497 U.S. at 825, 110 S. Ct. at 3151 (emphasis added). The Supreme Court reasoned that such "a *per se* rule of exclusion would not only frustrate the truthseeking purpose of the Confrontation Clause," but would also hinder States in their own "enlightened development in the law of evidence." *Wright*, 497 U.S. at 825, 110 S. Ct. at 3151-52. And for good reason—victims who by age or disability are unable to testify cannot satisfy *Crawford*'s required "opportunity for cross-examination."[3] However, that does not mean their statements are *per se* inadmissible. As the *Wright* Court recognized, even though a witness is incompetent to testify, she can nonetheless be "capable of receiving just impressions of the facts and of relating them truly." *Wright*, 497 U.S. at 825, 110 S. Ct. at 3151. Consistent with this principle, the Supreme Court later stated in *Ohio v. Clark*, a case involving a three-year-old child, on the question of whether statements by persons unable to testify should even be considered testimonial—the first prong of the *Crawford* rule:

> L. P.'s age fortifies our conclusion that the statements in question were not testimonial. *Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system.* Rather, "[r]esearch on children's understanding of the legal system finds that" young children "have little understanding of prosecution." Brief for American Professional Society on the Abuse of Children as *Amicus Curiae* 7, and n. 5 (collecting sources). And Clark does not dispute those findings. Thus, it is extremely unlikely that a 3-year-old

---

[3] Therefore, Tome's request for a deposition of T.C. in this case could serve no efficacious purpose, as T.C. was found to be unable to testify.

33

> child in L. P.'s position would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all.

*Ohio v. Clark*, 576 U.S. 237, 247-48, 135 S. Ct. 2173, 2181-82 (2015) (emphasis added).

¶46 In *Wright*, the Supreme Court recognized a "presumption" that untested statements from individuals unable to testify are "not worthy of reliance at trial," *Wright*, 497 U.S. at 821, 110 S. Ct. at 3150, but held the presumption could be rebutted and trustworthiness could be established upon a review of "the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright*, 497 U.S. at 820, 110 S. Ct. at 3149. The "unifying principle," the Supreme Court explained, is whether the declarant "was particularly likely to be telling the truth when the statement was made[,]" and must "be so trustworthy that adversarial testing would add little to its reliability." *Wright*, 497 U.S. at 821-22, 110 S. Ct. at 3149-50. The Supreme Court provided a non-exclusive list of factors to consider in making this determination, including the declarant's mental state, lack of motive to fabricate, spontaneity, repetition and use of terminology, *Wright*, 497 U.S. at 821-22, 110 S. Ct. at 3150, all of which are unrelated to the corroboration basis for admission that the Court determined was error.

¶47 Here, the District Court found that the severity of T.C.'s developmental disability and deafness rendered her unable to testify at trial, a determination not reversed by this Court. Nonetheless, the District Court found her statements were trustworthy based upon considerations appropriate under *Wright*, concluding the "time, content, and circumstances of T.C.'s statements to Gutschenritter, Smail, and Stone provide circumstantial guarantees

34

of trustworthiness." As the Court notes, the investigation of this incident began when T.C. "became emotional and distraught." Opinion, ¶ 4. The District Court found that T.C.'s communication with investigators was "somewhat difficult," but her "motivation to tell the truth was appropriate, given the sincerity of her statements" and the context around them. T.C. was very serious. Despite the difficulties in communication, T.C.'s statements were "direct, linear, and to-the-point." T.C. demonstrated appropriate "mental capacity" and related that a man named "Ricky" had first showed her a picture of a male and female having sex, then "knocked her out of her chair while she was eating, pulled her pants down, and had sex with her." T.C. related that "it was wrong and it really hurt." T.C. "signed the gesture for sexual intercourse multiple times throughout the interview when discussing the incident." The Court notes that T.C. related that "it bled, bled, bled, and hurt, hurt, hurt." The District Court found that all of T.C.'s statements were made "spontaneously" without prompting to each witness, and within one to two days after the alleged incident. The District Court's findings also addressed corroboration of T.C.'s testimony, but I would not consider those findings, which are improper under *Wright*. Thus, to the extent T.C.'s statement would be deemed testimonial in nature, I would conclude that the District Court's remaining findings satisfied the trustworthiness foundation necessary to admit the communications of T.C. because the record demonstrates that she was "particularly worthy of belief." *Wright*, 497 U.S. at 820, 110 S. Ct. at 3149.

¶48    In my view, if there was error it was in the admission of the video recording of the Stone's forensic interview of T.C., because to the jury it had the appearance of direct testimony. T.C.'s statements on video were not presented through the filtered observations

35

required under *Wright* to establish trustworthiness. The individuals testifying about T.C.'s statements to them were subject to cross examination, while the video interview, of course, was not. While trustworthiness is an evidentiary decision made by the trial court, I think the prejudicial effect, if not otherwise rendered harmless, outweighed the probative value even upon a proper trustworthiness foundation. However, even the "absolute" rule of *Crawford* permits Confrontation Clause violations to be assessed for harmless error. *See Crawford*, 541 U.S. at 42 n.1, 124 S. Ct. at 1359 n.1; 541 U.S. at 76, 124 S. Ct. at 1378 (Rehnquist, C.J., concurring) ("to the Court's credit is its implicit recognition that the mistaken application of its new rule by courts which guess wrong as to the scope of the rule is subject to harmless-error analysis"). I believe the error was harmless under the circumstances here. As introduced at trial, Tome told Schoen Andersch that he was in jail "for having sex without consent with a Jerry's kid." When Andersch said, "What?[,]" Tome replied that he was charged with "[f]ucking a Jerry's kid. . . . You know, Jerry Lewis' telethon, a fucking retard." Tome then told Andersch he was "going to get away with it" because "he used a rubber," which Andersch stated Tome had said "out of the blue." Consistent with T.C.'s statement, Tome later told Andersch that he "had to show the little girl pictures" of people engaging in sexual intercourse before engaging with T.C. Because Tome's statement generally confirms T.C.'s recounting of the event, I would conclude that any error in admitting T.C.'s video was harmless.

¶49    In response to this dissent, the Court has doubled down, resolute that *Crawford* is absolute. It offers many more case citations that merely repeat its general position, but, notably, cites no federal case that explicitly holds that *Wright* can no longer apply in the

36

context of victims who are incapable of testifying. And, there should be no such holding. If the most vulnerable victims of abuse in our society cannot be heard—ever—then there is something wrong with the constitutional rule.

¶50 We know this because judicial determinations within our constitutional system down through the history since our nation's founding have demonstrated repeatedly that constitutional rights are not absolute, but are subject to exceptions and require necessary flexibility to permit all rights to be honored. Even constitutional rights with stronger claims to textual absolutism than the confrontational right have been so balanced. *C.f.* U.S. Const. amend. I ("Congress *shall make no law . . .* abridging the freedom of speech") (emphasis added) and *State v. Lamoureux*, 2021 MT 94, ¶ 20, 404 Mont. 61, 485 P.3d 192 (noting federal decisions "illustrate that the intent or purpose of a person's speech can form the basis for excluding a person's speech from First Amendment protections"). In the "whereas" recitals for House Bill No. 742, "An Act Providing for the Admissibility of Hearsay Statements to Prove the Occurrence of, or the Identity of the Abuser, in Cases of Physical or Sexual Abuse of an Individual with a Developmental Disability," the Legislature found that the "physical or sexual abuse of an individual with a developmental disability is an abhorrent phenomenon that should not be tolerated in any society[.]" 2007 Mont. Laws ch. 282. In my view, this case, which does not permit application of the usual *Crawford* requirement of cross examination, illustrates the necessary flexibility that must narrowly remain under the Confrontation Clause, and does remain, and that the requirements of trustworthiness required under *Wright* were here established by the State to permit admission of T.C.'s statements.

¶51 I would affirm.

/S/ JIM RICE

Justice Beth Baker joins in the dissenting Opinion of Justice Rice.

/S/ BETH BAKER